QUINN EMANUEL URQUHART & SULLIVAN, LLP
Fred G. Bennett (Bar No. 59135)
  fredbennett@quinnemanuel.com
Robert J. Becher (Bar No. 193431)
  robertbecher@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

*Attorneys for Plaintiffs*
*Alternate Health USA Inc. and Alternate*
*Health Corp.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Alternate Health USA Inc. and Alternate Health Corp., <br><br> Plaintiffs, <br><br> v. <br><br> Paul Edalat, <br><br> Defendant. | CASE NO.  8:17-CV-01887 <br><br> **PLAINTIFFS ALTERNATE HEALTH USA INC.'S AND ALTERNATE HEALTH CORP.'S COMPLAINT FOR DAMAGES FOR:  (1) FRAUD IN THE INDUCEMENT; (2) FRAUD—MISREPRESENTATION, CONCEALMENT AND NONDISCLOSURE; (3) NEGLIGENT MISREPRESENTATION; (4) RESTITUTION FOR RESCISSION OF CONTRACT BASED ON FRAUD; AND (5) RESTITUTION FOR RESCISSION OF CONTRACT BASED ON NEGLIGENT MISREPRESENTATION** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Alternate Health USA Inc. ("AHUS") and Alternate Health Corp. ("AHC") (collectively, "Alternate," "Alternate Health," or "Plaintiffs") for their Complaint against Defendant Paul Edalat ("Edalat") allege as follows:

### INTRODUCTION

1.      Through this action, Alternate Health seeks: rescission and damages with regard to a consulting agreement it entered into with Edalat due to Edalat's

1    fraud; the return of shares of stock issued under the consulting agreement; and

2    damages.

3         2.     AHC is a health services company that provides products and services

4    to the medical cannabis industry.  AHUS is a subsidiary of AHC.

5         3.     Edalat, the Chairman of the Board of Sentar Pharmaceuticals

6    ("Sentar"), first met with representatives of Alternate Health in May 2016.  They

7    told Edalat that Alternate Health was interested in developing new business

8    opportunities, including, among other things, finding a company which had a

9    proven delivery mechanism for cannabidiol ("CBD") and the ability to

10   manufacture.  Edalat and Sentar were willing to say, and did say, whatever they

11   needed to convince Alternate Health to do business with them, even if it was false

12   or misleading.

13        4.     Edalat intentionally, or in reckless disregard of the truth, first

14   misrepresented to Alternate Health that he and Sentar had the facilities, expertise,

15   and capability to manufacture large quantities of dissolvable pills.  Edalat also

16   misrepresented that he was on the verge of being awarded a patent for a

17   transdermal CBD patch, and had the facilities to manufacture large quantities of

18   CBD as well as tetrahydrocannabinol ("THC") infused transdermal patches.

19        5.     Edalat intentionally failed to disclose to Alternate Health that the

20   FDA had accused him and Sentar's predecessor, Sci-Labs Nutraceuticals ("Sci-

21   Labs"), of manufacturing adulterated dietary supplements (also known as

22   "nutraceuticals") and that he, individually and on behalf of Sci-Labs, had entered

23   into a consent decree with the FDA that barred him and Sentar from manufacturing

24   such products at his manufacturing facility in Irvine, California or elsewhere.

25   Instead, he falsely claimed he and Sentar had the capability to manufacture dietary

26   supplements, including CBD pills, and had deep manufacturing expertise.  He

27   even gave Alternate Health personnel a tour of the Irvine, California

28   manufacturing facility.

6. Edalat also intentionally, or in reckless disregard of the truth, concealed that he was the subject of a personal bankruptcy proceeding that was ongoing when the negotiations and signing of the agreements referenced below occurred.

7. As a result of and in reliance on Edalat and Sentar's misrepresentations and concealments, AHUS and AHC entered into an Agreement for Consulting Services with Edalat ("Consulting Agreement") as well as a License Agreement for Sublingual Delivery System with Sentar ("Sublingual License Agreement"), which included CBD and other nutraceuticals. Pursuant to the Consulting Agreement, AHUS and AHC provided Edalat with 2,118,506 shares of stock in AHC, 480,000 of which Edalat assigned to others.

8. In late June 2017, Alternate Health first learned of Edalat's bankruptcy proceeding, which had been filed in July 2014. Subsequently, in August 2017, while reading an article about a jury verdict finding Edalat liable for fraud, defamation, and punitive damages in a lawsuit former business partners filed against Edalat, Sentar, and others in the United States District Court for the Central District of California (*Bruce Cahill, et al. v. Paul Edalat, et al.*, Case No. 8:16-cv-00686-AG-DFM), as well as other information, Alternate Health learned for the first time of the consent decree with the FDA, and realized it had been misled to believe that Sentar had the capability and expertise to manufacture sublingual tablets for dietary supplements. This action seeks the rescission of the Consulting Agreement, the return of all shares issued to Edalat, and damages on the basis of Edalat's misrepresentations.

## THE PARTIES

9. Plaintiff Alternate Health Corp. is a publicly traded Canadian corporation, with its headquarters and principal place of business in Toronto, Ontario, Canada. Its address is 56 Temperance St., Suite 300, Toronto, ON, M5H 3V5, Canada. Alternate Health Corp. leads the traditional medical and the medical

cannabis industry with effective, legal products and services that will provide a platform for improving and advancing patient outcomes with operational efficiencies, education, product development, and network-driven data results. Alternate Health Corp. was formed from a reverse takeover of Alternate Health, Inc.

10. Plaintiff Alternate Health USA Inc. is a Delaware company registered at 200 W. Madison St., Suite 3900, Chicago, IL, 60606, whose headquarters and principal place of business is at 7373 Broadway, Suite 307, San Antonio, TX 78209. It is a subsidiary of Alternate Health Corp.

11. Defendant Paul Edalat is a citizen of the state of California and resides in Orange County, California.

## JURISDICTION AND VENUE

12. This Court has diversity jurisdiction under 28 U.S.C. § 1332. Plaintiff Alternate Health Corp. is a publicly traded corporation incorporated under the laws of Canada with its principal place of business in Canada. Plaintiff Alternate Health USA Inc. is a corporation incorporated under the laws of Delaware with its principal place of business in Texas. Defendant Edalat is domiciled in and a citizen of California. The amount in controversy, without interests or costs, exceeds $75,000, as specified by 28 U.S.C. § 1332.

13. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims stated herein occurred within this District, and a substantial part of the property that is the subject of this action is situated here.

## FACTS GIVING RISE TO THE DISPUTE

14. Howard Mann ("Mann"), who was at the time a special advisor to the Board of Directors of AHC, and others from Alternate Health, including Dr. Michael Murphy, Jim Griffiths, George Mull, and Jim Tykoliz, were introduced to

Edalat and Olivia Karpinski ("Karpinski") of Sentar on May 19, 2016 at an event at the "ROC" business center at 604 Arizona Avenue in Santa Monica.

15.    Edalat used the trappings of wealth to convey that he was a successful and wealthy business person, even though he was actually in the middle of a personal bankruptcy proceeding at the time of the meeting, a fact he did not disclose.  For example, he arrived at the first meeting in a Rolls Royce.

16.    During the meeting, Edalat stated that he was involved with a pharmaceutical company known as Sentar.  Edalat told Mann that he and Sentar had patents on an "All Natural Non-Toxic Sublingual Drug Delivery System."  He said the patents covered sublingual, dissolvable pills that could be used for delivery of cannabinoids.  In fact, Sentar did not have issued patents as of this date.  Edalat and Karpinski also spoke falsely, among other things, about the efficacy of the patented delivery system.  Like Edalat, Karpinski also stated that Sentar had patents on an "All Natural Non-Toxic Sublingual Drug Delivery System."

17.    To demonstrate Sentar's expertise and capabilities, Edalat showed Mann samples of a generic Viagra product that he claimed to have manufactured. Edalat also showed Mann samples of a CBD pill and said that he had formulated and manufactured the pill.  CBD is one of the cannabinoids contained in cannabis. It does not have intoxicating effects like THC, also contained in cannabis.

18.    Edalat also claimed, falsely, that he and Sentar had a manufacturing facility which had the capability of mass producing sublingual CBD tablets, were world experts in the manufacture of dietary supplements generally, and had a dedicated and experienced staff that had worked with them on the manufacture of dietary supplements for many years.   Edalat also said transdermal patches for CBD and THC could be manufactured at Sentar's facility and Sentar would oversee the manufacture.

19.  The patents and manufacturing capability that Edalat discussed during the meeting were of great interest to Alternate Health since it had an interest in a reliable delivery mechanism for CBD and a way to manufacture that mechanism. As a result, Alternate Health continued to speak with Sentar regarding a business relationship after the initial meeting.

20.  Just a few days after their first meeting, Mann and others from Alternate Health, including James Tykoliz, visited Edalat's manufacturing facility at 17809 Gillette Avenue in Irvine, California ("Gillette Avenue Manufacturing Facility").  Edalat, Karpinski, and Edalat's sister, Farah Barghi, were present. During this visit, Edalat again spoke to the group about his and Sentar's manufacturing capability for the CBD sublingual tablets and said that the CBD transdermal patches could be manufactured at the Gillette Avenue Manufacturing Facility.

21.  During a tour of the Gillette Avenue Manufacturing Facility on or about June 25, 2016, Karpinski told Walter Grieves, Stephen Bugbee and Howard Mann of Alternate Health and persons visiting from Canada that Sentar had everything in place to manufacture sublingual CBD tablets.  At a lunch later that same day at The Resort at Pelican Hill, Edalat falsely claimed he was an expert in the manufacture of nutraceuticals.

22.  During a July 11, 2016 meeting at the "ROC" business center attended by Howard Mann, Amir Asvadi, Walter Grieves, and Tony Sanchez, Jr., the President of the Seminole Tribe of Florida, Inc., Edalat falsely stated that he and Sentar had the ability and expertise to manufacture, package, and distribute sublingual tablets with CBD.  During a lunch meeting with Amir Asvadi, who at the time was a potential investor in Sentar, and Howard Mann in Long Beach on July 15, 2016, Edalat falsely stated that he and Sentar could manufacture sublingual CBD tablets and transdermal patches could be manufactured at the

Gillette Avenue Manufacturing Facility.  He also said that he and Sentar were on the verge of obtaining issued patents for CBD transdermal patches.

23.     Jim Tykoliz and Howard Mann of Alternate Health attended another meeting with Edalat prior to September 2016.  Rick Darnell and the former President of the San Jose Sharks hockey team were also in attendance.  Edalat falsely claimed that he and Sentar had patents on a sublingual CBD pill and that he had patents on a transdermal patch.

24.     Edalat also claimed he had great business connections to raise money and offered to introduce Alternate Health to potential investors.  He organized an event, at Alternate Health's expense, at the prestigious Balboa Bay Club in Newport Beach, California for the purpose of finding people to invest in Alternate Health as well as in his company, Sentar.  During this meeting, Edalat told the attendees about the Gillette Avenue Manufacturing Facility, and reiterated his expertise and capability to manufacture dietary supplements.  None of the attendees decided to invest.

25.     AHUS and AHC later began to negotiate the Consulting Agreement and the Sublingual License Agreement.  A true and correct copy of the Consulting Agreement is attached as Exhibit A and a true and correct copy of the Sublingual License Agreement is attached as Exhibit B.  AHUS, AHC, and Edalat agreed that both the Consulting Agreement and Sublingual License Agreement would be non-binding until after AHC was publicly listed on the Canadian Securities Exchange. The final Consulting Agreement and Sublingual License Agreement were signed on January 9, 2017.

26.     The process of taking AHC public commenced in mid-October 2016 and AHC began trading on the Canadian Securities Exchange on January 24, 2017.

27.     Edalat also told Alternate Health, falsely, that he was the world's leading expert on nutraceuticals during a meeting in the conference room of the Gillette Avenue Manufacturing Facility in or about April 2017.  Howard Mann,

Stephen Bugbee, George Mull, and foreign visitors who were touring the facility attended the meeting.  Edalat made a similar statement during a June 2017 meeting in Venice, California attended by Howard Mann, George Mull, Dr. Murphy, Dr. Jamison Feramisco, and Jade Green of Alternate Health.

### THE CONSULTING AGREEMENT

28.    Under the Consulting Agreement between Edalat, AHUS, and AHC, Edalat was ████████████████████████████████████████████

████████████████████████████████████████ Ex. A at § 1.1. ██████████████████████████████████████████

███████████████████████████████████████ *Id.* at Recitals, subheading A.

29.    Edalat agreed to provide ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████ *Id.* at § 1.1.   Edalat also agreed to ████████████████

████████████████████████████████████████████████

██████████

30.    Per the Consulting Agreement, Edalat was to receive (i) 325,000 common shares of AHC "with a deemed value of $1.00 per share" at the time the Consulting Agreement was executed; (ii) "Common Stock of AHC with an aggregate value of US$1,150,000, based on a valuation of C$1.00 per share, or 1,293,506 shares";   and (iii) "500,000 common shares of AHC, based on a valuation of C$1.00 per share, ████████████████████████████████

████████████████████████████████████████████████

*Id.* at §§ 2.1(a), 2.1(b), and 2.1(c).

31.    The Consulting Agreement further provided, on the assumption that Edalat had not fraudulently induced Alternate Health to enter into the Agreement and had the right to receive shares thereunder, that ███████████████

███████████████████████████████████████

████████████████████████ *Id.* at § 3.3.

32.    On January 9, 2017, Edalat invoked the assignment provision of his Consulting Agreement to assign 480,000 of his allotted shares to six individuals. *Id.* at 5 (Addendum to Consulting Agreement).

33.    Edalat assigned shares as follows: 300,000 shares to Amir Asvadi; 50,000 shares to Federico Guillermo Cabo; 50,000 shares to Federico Guillermo Cabo Alvarez; 50,000 shares to Farah Barghi, Edalat's sister; 15,000 shares to Nicole Fletcher; and 15,000 shares to Olivia Karpinski.  *Id.*

34.    On February 22, 2017, AHC's Board of Directors approved the issuance of the 480,000 shares to the respective individuals as specified in paragraph 33, and 1,638,506 shares to Paul Edalat.

## THE SUBLINGUAL LICENSE AGREEMENT

35.    On January 9, 2017, contemporaneously with the Consulting Agreement, Sentar signed the Sublingual License Agreement to which AHUS and AHC were counterparties.  Ex. B (Sublingual License Agreement).  Edalat signed on behalf of Sentar in his capacity as a Director of Sentar.

36.    The Sublingual License Agreement granted AHUS and AHC an

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

-9-

1     ██████████ *Id.* at § 2.1. The Sublingual License Agreement's Exhibit A, titled

2     ████████████████████████████████████████████████

3     ████████████████████████████████████████████████

4     ████████████████████████████████████████████████

5     ██████ *See id.* at Ex. A thereto.

6     37. For their part, AHUS and AHC agreed to use ████████████

7     ████████████████████████████████████████████████

8     ████████████████████████████████████████████████

9     ████████████ *Id.* at § 11.1. The parties to the Sublingual License Agreement

10 also agreed to ██████████████████████████████████████

11     ████████████████████████████████████████████████

12     ████████████████████████████████████████████████

13     ████████████████ *Id.* at § 23.

14     38. On February 22, 2017, AHC's Board of Directors approved the

15 issuance of 850,000 shares to Sentar pursuant to the License.

16     39. After the Sublingual License Agreement went into effect, Alternate

17 Health devoted significant time, money, and resources to performing its

18 obligations under the License Agreement. For example, Alternate Health built a

19 website for the sublingual tablet product, hired a production team, formulated a

20 marketing and distribution plan, wrote advertisements, worked on packaging for

21 the tablets, set up meetings with potential distributors, created and funded a hemp

22 facility to obtain the CBD product, set up interim sourcing for CBD, supported

23 clinical studies on individuals with the Zika virus, and entered into discussions

24 with Canadian licensed providers about manufacturing and delivery in the

25 Canadian market.

26     **THE MANUFACTURING AGREEMENT**

27     40. On January 16, 2017, AHUS also entered into a Manufacturing

28 Agreement with Sentar which obligated Sentar to manufacture a prototype set of

pills ("Manufacturing Agreement").  A true and correct copy of the Manufacturing Agreement is attached as Exhibit C.

41.    The Manufacturing Agreement specifies that AHUS will pay Sentar $150,000 in exchange for the production of a yet-to-be-determined amount of tablets from "approximately 1 kilo of Raw Material" to be supplied by AHUS.  *Id.*

42.    In disregard of the Consent Decree, Edalat and Sentar manufactured hundreds of sublingual CBD tablets and delivered them to Alternate Health in large plastic pill bottles.  Edalat told Alternate Health that he was personally involved in the manufacturing.  Edalat and Sentar also separately manufactured THC pills at the Gillette Avenue Manufacturing Facility and delivered the pills to Howard Mann.

### ALTERNATE HEALTH DISCOVERS EDALAT'S DECEIT

43.    In June 2017, Alternate Health learned that Edalat had just recently emerged from a bankruptcy proceeding he filed in July 2014.  It was not until August 2017 that Alternate Health learned that Sentar had repeatedly provided Alternate Health with false and misleading information.  While reading an August 9, 2017 press release and other information about a verdict against Paul Edalat in a case filed against him in the United States District Court for the Central District of California, representatives of Alternate Health were shocked to learn that, on November 12, 2014, a federal court had ordered an Edalat-controlled company, Sci-Labs Nutraceuticals, Inc., Edalat, and their successors and assigns, among others, to shut down, cease all of their operations, and destroy all of their existing products because they had failed to comply with FDA good manufacturing practices and ignored repeated warnings from the FDA ("Consent Decree").

44.    The Consent Decree resulted from a Complaint the FDA filed against both Edalat, the Chairman of the Board and CEO of Sci-Labs Nutraceuticals, Inc.

(the predecessor corporation to Sentar), and Sci-Labs Nutraceuticals, Inc. on November 4, 2014.  The Complaint alleged that they:

> violate 21 U.S.C. § 331(a) by introducing or delivering for introduction, or causing to be introduced or delivered for introduction, into interstate commerce articles of food (dietary supplements), as defined by 21 U.S.C. § 321(ff), that are adulterated within the meaning of 21 U.S.C. § 342(g)(1) in that they have been prepared, packed, or held in violation of current good manufacturing practice regulations for dietary supplements ("Dietary Supplement CGMP"), as set forth in 21 C.F.R. Part 111. [Edalat and Sci-Labs also] violate 21 U.S.C. § 331(k) by causing articles of food (dietary supplements) that Defendants hold for sale after shipment of one or more of their components in interstate commerce to be adulterated within the meaning of 21 U.S.C. § 342(g)(1).

45.     The Consent Decree remains in effect to this day.  A true and correct copy of the Complaint for Permanent Injunction and Consent Decree are attached as Exhibit D.   The Consent Decree specifically states that Edalat, Sci-Labs Nutraceuticals, Inc., "and each and all of their directors, officers, agents, representatives, employees, attorneys, successors and assigns, and any and all persons or entities in active concert or participation with any of them who have received actual notice of this Decree by personal service or otherwise, are permanently restrained and enjoined under 21 U.S.C. § 332(a), and the equitable authority of this Court, from directly or indirectly manufacturing, preparing, packing, labeling, holding, or distributing any dietary supplements, at 17809 Gillette Avenue, Irvine, California 92614-6501, or at or from any other locations at which Defendants now, or in the future, directly or indirectly manufacture, prepare, pack, repack, label[,] hold, and/or distribute dietary supplements" unless they fulfilled certain onerous conditions, which they never fulfilled.   Ex. D (Complaint/Consent Decree) at *15 (¶ 5 of Consent Decree).

46.     At the time of Edalat's initial meetings with Alternate Health representatives, and at all subsequent meetings with Alternate Health leading up to the parties entering into the Consulting Agreement, Edalat failed to disclose the Consent Decree, the substance of the Consent Decree, and the material effects of

the Consent Decree on the Consulting Agreement even though he was aware of the Consent Decree, knew he and Sentar were bound by the Consent Decree, and knew that the Consent Decree prohibited him and Sentar from manufacturing dietary supplements referenced in the Consulting and Sublingual License Agreements, including the sublingual tablets containing CBD.

47.   If Alternate Health had been informed of the Consent Decree, it would not have entered into the Consulting Agreement under which it retained Edalat to provide advice and assistance with, among other things, ███████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████   The Consent Decree demonstrated that Edalat lacked the basic competence and ability to perform these tasks.

### FIRST CAUSE OF ACTION:  FRAUD IN THE INDUCEMENT

48.   Alternate Health hereby incorporates all of the above paragraphs as though fully set forth herein.

49.   Beginning on or around May 19, 2016, and on multiple subsequent occasions described above, Edalat falsely represented that he and Sentar were capable of mass producing dietary supplements (referenced in the License Agreement as "nutraceuticals") such as sublingual CBD tablets, were experts in the manufacture of dietary supplements, and that transdermal patches infused with CBD could be manufactured at the Gillette Avenue Manufacturing Facility.  These representations are now, and were when made, false, and Edalat knew them to be false at the time these representations were made.

50.   Edalat concealed and failed to disclose other material facts which materially qualified the facts disclosed, or which rendered the disclosure likely to mislead, including but not limited to, the existence of the Consent Decree, the fact

that a Consent Decree barred Edalat and Sentar from manufacturing dietary supplements, and the circumstances leading to the Consent Decree. Edalat's concealment and omission of material facts makes any and all other disclosures by Edalat deceptive.

51. Edalat also misrepresented to Alternate Health that he and Sentar had the facilities, expertise, and capability to manufacture large quantities of the dissolvable tablets. Edalat also misrepresented that he was on the verge of being awarded a patent for a transdermal CBD patch.

52. Edalat also concealed that he was the subject of a personal bankruptcy proceeding that was ongoing when the negotiations and signing of both the Consulting Agreement and Sublingual License Agreement occurred.

53. Edalat made these misrepresentations and concealed and failed to disclose these material facts intentionally, or in reckless disregard of the truth, with the intent to induce Alternate Health into entering into agreements that were lucrative for Edalat and his company, including the Consulting Agreement.

54. In entering into the Consulting Agreement, as well as the Sublingual License Agreement, Alternate Health was not aware of the falsity of the representations by Edalat. In entering into these Agreements, Alternate Health was not aware of the existence of the concealed and omitted material facts, which Edalat failed to disclose.

55. Alternate Health reasonably relied on Edalat's misrepresentations and deceptions based upon omitted material facts, and entered into the Consulting Agreement. Alternate Health would not have entered into the Consulting Agreement had it been aware of Edalat's misrepresentations and concealments.

56. As a direct and proximate cause of Edalat's misrepresentations, concealment, and failures to disclose, and Alternate Health's reliance thereon, AHC and AHUS were damaged by, among other things, issuing 2,118,506 shares (valued at $2.58 Canadian Dollars per share on the Canadian Securities Exchange

as of closing on October 26, 2017, which is $4,252,349.98 United States Dollars using the current exchange rate as of October 26, 2017) to Edalat and his assignees pursuant to the Consulting Agreement.

57.    Alternate Health's reliance on Edalat's misrepresentations, concealment, and failures to disclose was a substantial factor in causing Alternate Health's damages.

58.    AHC and AHUS are entitled to rescission of the Consulting Agreement, and to the return of the 2,118,506 shares provided to Edalat pursuant to the Consulting Agreement.

## SECOND CAUSE OF ACTION: FRAUD—MISREPRESENTATION, CONCEALMENT, AND NONDISCLOSURE

59.    Alternate Health hereby incorporates all of the above paragraphs as though fully set forth herein.

60.    Beginning on or around May 19, 2016 at the Santa Monica, California meeting, and on multiple subsequent occasions described above, Edalat falsely represented that he and Sentar were capable of mass producing dietary supplements, including CBD tablets, were experts in the manufacture of dietary supplements, and that transdermal patches infused with CBD could be manufactured at the Gillette Avenue Manufacturing Facility.  The representations made by Edalat are now, and were when made, false, and Edalat knew them to be false at the time they were made.

61.    Edalat concealed and failed to disclose other material facts which materially qualified the facts disclosed, or which rendered the disclosure likely to mislead, including, but not limited to, the existence of the Consent Decree, the fact that a Consent Decree barred Edalat and Sentar from manufacturing dietary supplements, and the circumstances leading to the Consent Decree.  Edalat's concealment and omission of material facts makes any and all other disclosures by Edalat deceptive.

62.    Edalat misrepresented to Alternate Health that he and Sentar had the facilities, expertise, and capability to manufacture large quantities of the dissolvable pills.  Edalat also misrepresented that he was on the verge of being awarded a patent for a transdermal CBD patch.

63.    Edalat also concealed that he was the subject of a personal bankruptcy proceeding that was ongoing when the negotiations and signing of both the Consulting Agreement and Sublingual License Agreement occurred.

64.    Edalat made these misrepresentations and concealed and failed to disclose these material facts intentionally, or in reckless disregard of the truth, with the intent to induce Alternate Health into entering into a business relationship with Sentar.

65.    Alternate Health was not aware of the falsity of the representations, nor of the existence of the concealed and omitted material facts which Edalat failed to disclose.    Alternate Health reasonably relied on Edalat's misrepresentations and deceptions based upon concealed and omitted material facts, and entered into the Consulting Agreement.  Alternate Health would not have entered into the Consulting Agreement had it been aware of Edalat's misrepresentations and concealments.

66.    As a direct and proximate cause of Edalat's misrepresentations, concealments, and failures to disclose, and Alternate Health's reliance thereon, AHC and AHUS incurred damages, by, among other things, issuing 2,118,506 shares (valued at $2.58 Canadian Dollars per share on the Canadian Securities Exchange as of closing on October 26, 2017, which is $4,252,349.98 United States Dollars using the current exchange rate as of October 26, 2017) to Edalat and his assignees pursuant to the Consulting Agreement.

67.    Alternate Health's reliance on Edalat's misrepresentations, concealment, and failures to disclose was a substantial factor in causing Alternate Health's damages.

**THIRD CAUSE OF ACTION:  NEGLIGENT MISREPRESENTATION**

68.    Alternate Health hereby incorporates all of the above paragraphs as though fully set forth herein.

69.    Beginning on or around May 19, 2016 at the Santa Monica, California meeting, and on multiple subsequent occasions described above, Edalat represented that he and Sentar were capable of mass producing dietary supplements, including CBD tablets, were experts in the manufacture of dietary supplements, and that transdermal patches infused with CBD could be manufactured at the Gillette Avenue Manufacturing Facility.

70.    Edalat represented to Alternate Health that he and Sentar had the facilities, expertise, and capability to manufacture large quantities of the dissolvable pills.  Edalat also represented that he was on the verge of being awarded a patent for a transdermal CBD patch.

71.    Edalat had no reasonable grounds for believing these representations to be true when he made them.  The representations made by Edalat are now, and were when made, false.

72.    Edalat made these representations with the intent to induce Alternate Health into entering into agreements that were lucrative for Edalat and his company, including the Consulting Agreement.

73.    Alternate Health was not aware of the falsity of the representations. Alternate Health reasonably relied on Edalat's representations and entered into the Consulting Agreement.   Alternate Health would not have entered into the Consulting Agreement had it been aware of the falsity of Edalat's representations.

74.    As a direct and proximate cause of Edalat's representations, and Alternate Health's reliance thereon, AHC and AHUS incurred damages, by, among other things, issuing 2,118,506 shares (valued at $2.58 Canadian Dollars per share on the Canadian Securities Exchange as of closing on October 26, 2017, which is $4,252,349.98 United States Dollars using the current exchange rate as of

October 26, 2017) to Edalat and his assignees pursuant to the Consulting Agreement.

75. Alternate Health's reliance on Edalat's representations was a substantial factor in causing Alternate Health's damages.

**FOURTH CAUSE OF ACTION: RESTITUTION FOR RESCISSION OF CONTRACT BASED ON FRAUD**

76. Alternate Health hereby incorporates all of the above paragraphs as though fully set forth herein.

77. AHC and AHUS entered into the Consulting Agreement based on Edalat's misrepresentations, concealment, and deceptions based upon omitted material facts.

78. Beginning on or around May 19, 2016, and on multiple subsequent occasions, Edalat, on behalf of Sentar, falsely represented that he and Sentar were capable of mass producing dietary supplements, such as sublingual CBD tablets, were experts in the manufacture of dietary supplements, and that transdermal patches infused with CBD could be manufactured at the Gillette Avenue Manufacturing Facility. These representations are now, and were when made, false, and Edalat knew them to be false at the time they were made.

79. Edalat concealed and failed to disclose other material facts which materially qualified the facts disclosed, or which rendered the disclosure likely to mislead, including, but not limited to, the existence of the Consent Decree, the fact that the Consent Decree barred Edalat and Sentar from manufacturing dietary supplements, and the circumstances leading to the Consent Decree. Edalat's concealment and omission of material facts makes any and all other disclosures by Edalat and Sentar deceptive.

80. Edalat misrepresented to Alternate Health that he and Sentar had the facilities, expertise, and capability to manufacture large quantities of the

dissolvable pills. Edalat also misrepresented that he was on the verge of being awarded a patent for a transdermal CBD patch.

81. Edalat also concealed that he was the subject of a personal bankruptcy proceeding that was ongoing when the negotiations and signing of both the Consulting Agreement and Sublingual License Agreement occurred.

82. Edalat made these misrepresentations and concealed and failed to disclose these material facts to induce Alternate Health into entering into lucrative agreements with him and his company, Sentar, including the Consulting Agreement. Edalat made these misrepresentations and concealed and failed to disclose these material facts intentionally, or in reckless disregard of the truth.

83. Alternate Health reasonably relied on Edalat's misrepresentations, concealments, and deceptions based upon omitted material facts, and entered into the Consulting Agreement.

84. As a direct and proximate cause of Edalat's misrepresentations, concealment, and deceptions based upon omitted material facts, and Alternate Health's reliance thereon, AHC and AHUS issued 2,118,506 shares (valued at $2.58 Canadian Dollars per share on the Canadian Securities Exchange as of closing on October 26, 2017, which is $4,252,349.98 United States Dollars using the current exchange rate as of October 26, 2017) to Edalat and his assignees pursuant to the Consulting Agreement. For its part, Alternate Health did not receive any financial consideration from Edalat.

85. Alternate Health was unaware of the falsity of the material misrepresentations regarding Edalat and Sentar's manufacturing capabilities (or lack thereof), and was unaware of the existence of the concealed and omitted material facts, including the existence of the Consent Decree. Alternate Health would not have entered into the Consulting Agreement if these facts had been disclosed at the time the contracts were formed. Alternate Health's reliance on

Edalat's negligent misrepresentations was a substantial factor in causing Alternate Health's damages.

86.     AHC and AHUS were fraudulently induced to enter into the Consulting Agreement based on misrepresentations and omissions by Edalat. AHC and AHUS are entitled to rescission of the Consulting Agreement and to the return of the 2,118,506 shares provided to Edalat pursuant to the Consulting Agreement.

**FIFTH CAUSE OF ACTION:  RESTITUTION FOR RESCISSION OF CONTRACT BASED ON NEGLIGENT MISREPRESENTATION**

87.     Alternate Health hereby incorporates all of the above paragraphs as though fully set forth herein.

88.     AHC and AHUS entered into the Consulting Agreement based on negligent misrepresentations by Edalat.

89.     Beginning on or around May 19, 2016 at the Santa Monica, California meeting, and on multiple subsequent occasions, Edalat represented that he and Sentar were capable of mass producing dietary supplements, including CBD tablets, were experts in the manufacture of dietary supplements, and that transdermal patches infused with CBD could be manufactured at the Gillette Avenue Facility.

90.     Edalat represented to Alternate Health that he and Sentar had the facilities, expertise, and capability to manufacture large quantities of the dissolvable pills.  Edalat also represented that he was on the verge of being awarded a patent for a transdermal CBD patch.

91.     Edalat had no reasonable grounds for believing these representations to be true when he made them.  The representations made by Edalat are now, and were when made, false.

92.     Edalat made these representations with the intent to induce Alternate Health into entering into agreements that were lucrative for Edalat and his company, including the Consulting Agreement.

93.    Alternate Health was not aware of the falsity of the representations. Alternate Health reasonably relied on Edalat's representations and entered into the Consulting Agreement.    Alternate Health would not have entered into the Consulting Agreement had it been aware of the falsity of Edalat's representations.

94.    As a direct and proximate cause of Edalat's representations, and Alternate Health's reliance thereon, AHC and AHUS incurred damages, by, among other things, issuing 2,118,506 shares (valued at $2.58 Canadian Dollars per share on the Canadian Securities Exchange as of closing on October 26, 2017, which is $4,252,349.98 United States Dollars using the current exchange rate as of October 26, 2017) to Edalat and his assignees pursuant to the Consulting Agreement.    For its part, Alternate Health did not receive any financial consideration from Edalat.

95.    Alternate Health's reliance on Edalat's negligent misrepresentations was a substantial factor in causing Alternate Health's damages.

96.    AHC and AHUS were induced to enter into the Consulting Agreement based on negligent misrepresentations by Edalat. AHC and AHUS are entitled to rescission of the Consulting Agreement and to the return of the 2,118,506 shares provided to Edalat pursuant to the Consulting Agreement.

### **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, and each of them, respectfully demand relief as follows:

A.    That the Court enter judgment for Alternate Health on the above claims for relief;

B.    A determination that AHC and AHUS are entitled to a rescission of the Consulting Agreement, and that Edalat must return the 2,118,506 shares of AHC stock he received pursuant to the Consulting Agreement;

C.    The imposition of a constructive trust over the 2,118,506 shares of AHC stock provided to Edalat pursuant to the Consulting Agreement;

D.     Compensatory and consequential damages in an amount to be proven at trial;

E.     Punitive damages;

F.     An award of all taxable costs allowable;

G.     Pre-judgment and post-judgment interest as provided by law;

H.     An award of attorneys' fees and costs; and

I.     Such other and further relief as this Court deems just and proper.

### **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury on all triable issues pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated:  October 26, 2017          QUINN EMANUEL
                                  URQUHART & SULLIVAN, LLP


                                  By: */s/ Fred G. Bennett*
                                      Fred G. Bennett
                                      Robert J. Becher

                                      *Attorneys for Plaintiffs Alternate Health*
                                      *USA Inc. and Alternate Health Corp.*