John J. E. Markham, II (CA Bar No. 69623)
Email: jmarkham@markhamread.com
MARKHAM & READ
One Commercial Wharf West
Boston, Massachusetts 02110
Tel: (617) 523-6329
Fax: (617) 742-8604

*Attorneys for Plaintiffs Alternate Health USA Inc.,*
*Alternate Health Corp., and Alternate Health, Inc.*

### IN THE UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| Alternate Health USA Inc., Alternate Health Corp., and Alternate Health, Inc., <br><br> Plaintiffs, <br> v. <br><br> Paul Edalat, Olivia Karpinski, Farah Barghi, EFT Global Holdings, Inc. d/b/a Sentar Pharmaceuticals, and APS Health Sciences, Inc., <br><br> Defendants. | **CASE NO:  8:17-cv-1887-CJC-JDE** <br><br> **PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DAMAGES FOR: (1) FRAUD IN THE INDUCEMENT; (2) FRAUD, MISREPRESENTATION, AND CONCEALMENT AND NONDISCLOSURE; (3) RESTITUTION FOR RESCISSION OF CONTRACT BASED ON FRAUD; (4) FOR BREACH OF CONTRACT; AND (5) FOR INTERFERENCE WITH CONTRACT AND PROSPECTIVE BUSINESS ADVANTAGE** |

Plaintiffs Alternate Health USA Inc. ("Alternate Health USA"), Alternate Health Corp. ("AHC") and Alternate Health, Inc., (sometimes collectively referred to as "Plaintiffs" or "Plaintiff Entities") for their Second Amended Complaint against Defendants Paul Edalat ("Edalat"), Olivia Karpinski ("Karpinski"), Farah Barghi ("Barghi"), EFT Global Holdings, Inc. d/b/a Sentar Pharmaceuticals ("Sentar") and APS Health Sciences, Inc. ("APS") allege as follows:

## **INTRODUCTION**

1.      Through this action, Plaintiffs seek rescission of various agreements made between the Plaintiffs and several of the Defendants, rescission of the numerous shares of Alternate Health Corp. stock issued by it to several of the Defendants, and damages against all Defendants.

2.      This relief is sought as a result of all of the Defendants' misconduct in relation to various agreements made between Plaintiffs and some of the Defendants, and further as a result of the various fraudulent representations Defendants made to Plaintiffs, and further as a result of omissions of relevant information Defendants failed to disclose to Plaintiffs, all of which caused Plaintiffs the economic injury described in this Second Amended Complaint and for which they seek damages.

3.      Plaintiffs are all companies that provide various medical services and products relating to the medical cannabis industry, as well as in related fields.

4.      As of May, 2016, Defendants Edalat and Sentar were desperate for money. They had both been sued by various investors who claimed that they had been defrauded by Edalat; Edalat had filed personal bankruptcy for yet a third time; Edalat was involved in another lawsuit in which a judgment was ultimately entered by the Court against him for over three million dollars; and Edalat and various of his affiliated companies had many tax and other debts and liens filed against them of record in Orange County, California.

5.      Learning that Plaintiffs were interested in various products and services relating to the medical cannabis industry, and commencing in May of 2016, Defendants Edalat, Sentar, Karpinski and Barghi met with or communicated with Plaintiffs and knowingly made numerous false representations to Plaintiffs (described further below) in order to fraudulently induce Plaintiffs to (i) enter into various agreements with Edalat and Sentar, (ii) issue to Edalat, Sentar, Karpinski and Barghi, among others, certain stock shares in Plaintiff Alternate Health Corp., and (iii) pay certain sums of money to Edalat and Sentar.

6.      Moreover, at the same time that these Defendants were making false representations to Plaintiffs, Edalat and Sentar were in the very bad financial situation described above and further below, all Defendants well knew of this bad financial situation of Edalat and Sentar, and nonetheless Defendants met and communicated with Plaintiffs and their representatives, did not disclose  to Plaintiffs

any of Edalat's bad financial circumstances  and, instead of being truthful, pretended that Edalat was extravagantly wealthy, highly successful as a business man, and, Defendants all claimed, was very well-accomplished as a business person dealing with the Food and Drug Administration (the "FDA"), particularly as his relations with that agency related to Sentar and its ongoing work which required interaction with the FDA. All of the above was false, as was well known to all the Defendants.

7.     As a result of and in reliance upon Edalat's, Karpinski's, Barghi's and Sentar's misrepresentations, false pretenses, and omissions, all of which were material to Plaintiffs, Plaintiffs Alternate Health Corp, Alternate Health USA, and Alternate Health, Inc. entered into various agreements with Sentar and Edalat. Additionally, Alternate Health Corp. issued many shares of its stock to all the Defendants, and the Plaintiffs paid substantial sums of cash to Edalat.

8.     Defendants have now learned of the false representations, omissions, and pretenses engaged in by these Defendants and have learned of the material facts Defendants failed to disclose to them, and Plaintiffs seek by this action to rescind all the agreements entered into between the parties, seek the return of all stock issued to Defendants by AHC, seek damages against Defendants according to proof at trial, and seek other appropriate relief as determined by this Court.

1

## THE PARTIES

2

3

4

9.      Plaintiff Alternate Health Corp. is a publicly traded Canadian

corporation with its headquarters and principal place of business in Toronto,

5

6

Ontario, Canada. Its address is 56 Temperance Street, Suite 300, Toronto, Ontario,

M5H 3V5, Canada. AHC leads the traditional medical and the medical cannabis

7

8

industry with effective, legal products and services that will provide a platform for

9

improving and advancing patient outcomes with operational efficiencies, through

10

11

education, product development, and network-driven data results.

12

10.     Plaintiff Alternate Health USA is a Delaware company registered at

13

14

200 W. Madison St., Suite 3900, Chicago, Illinois, 60606, whose headquarters and

principal place of business is at 7373 Broadway, Suite 307, San Antonio, Texas,

15

16

78209. It is a subsidiary of AHC.

17

11.     Plaintiff Alternate Health, Inc. is a Delaware corporation, with its

18

19

headquarters and principal place of business at 7373 Broadway, Suite 307, San

20

Antonio, TX 78209. It is a subsidiary of Alternate Health Corp. and is a diversified

21

healthcare investment and holding company that seeks to provide practice

22

23

management and controlled substance management software, blood analysis and

24

toxicology labs, clinical research, continuing education programs, nutraceutical

25

26

products, and security and control services to the emerging cannabis industry.

27

28

12.     Defendant Paul Edalat ("Edalat") is a citizen of the state of California and resides in Orange County, California.

13.     Defendant Olivia Karpinski ("Karpinski") is a citizen of the state of California and resides in Orange County, California. She holds herself out as being the Executive Director of Sales of Sentar.

14.     Defendant Farah Barghi ("Barghi') is a citizen of the state of California and resides in Orange County, California.  She is Edalat's sister, holds herself out to be the Director and Brand Manager of Defendant APS Health Sciences, Inc. and the Director of Compliance of Defendant Sentar Pharmaceuticals. She drafts and finalizes the publications circulated by Sentar on behalf of and in consultation with Edalat and Karpinski.

15.     Defendant EFT Global Holdings, Inc. (d/b/a "Sentar Pharmaceuticals") (herein "Sentar") is a Nevada corporation formed on July 2, 2013 that has its principal place of business in Las Vegas, Nevada. It has operated since its inception through two fictitious names, at separate times. Since early 2015, Sentar has used the fictitious d/b/a "Sentar Pharmaceuticals." Before Sentar Pharmaceuticals became the fictitious d/b/a for Global Holdings, Global Holdings' prior fictitious d/b/a was "Scilabs Pharmaceuticals." Edalat and Barghi changed the d/b/a from Scilabs Pharmaceuticals to Sentar Pharmaceuticals because another Edalat-owned entity, Scilabs Nutraceuticals, Inc., was shut down in late November,

2014 by a federal court order obtained by the FDA. The Court shut down Scilabs Nutraceuticals, Inc. upon a showing by the FDA that Scilabs Nutraceuticals, Inc. and Edalat had repeatedly violated the health and safety standards required by United States law in connection with Edalat's manufacturing of dietary supplements under the name Scilabs Nutraceuticals, Inc. Because of the bad publicity associated with the court-ordered shutdown of Scilabs Nutraceuticals, Inc., and the close name similarity between the shut-downed Scilabs Nutraceuticals, Inc. and the d/b/a Scilabs Pharmaceuticals that Global Holdings was using, Edalat and Barghi changed the d/b/a of Scilabs Pharmaceuticals in late 2014 to the d/b/a "Sentar Pharmaceuticals" so that prospective investors in Edalat's and Barghi's ventures, including the Plaintiffs in this lawsuit, would not be deterred from investing with Edalat because of the shutdown of Scilabs Nutraceuticals, Inc. This d/b/a name change was done knowingly by Barghi and Edalat in order to conceal from prospective investors, including Plaintiffs herein, that  Edalat's other company, Scilabs Nutraceuticals, Inc., was sued and enjoined by the FDA and the federal court for serious safety violations, because if his association with that lawsuit became known to investors, they would thereafter not be duped by his misrepresentation that he had a long and successful relationship with the Food & Drug Administration.

*PLAINTIFFS ALTERNATE HEALTH USA INC., ALTERNATE HEALTH CORP., AND ALTERNATE HEALTH, INC.'S SECOND AMENDED COMPLAINT* - Case No. 8:17-cv-1887-CJC-JDE

7

16.     Moreover, Sentar is controlled by Edalat and by Barghi, who acts with and for Sentar under the control and direction of Edalat.  Sentar has no separate existence apart from Edalat, and instead it acts as Edalat tells it to act and exists and acts solely as Edalat's *alter ego*, doing only what he commands, either directly or through Farah Barghi, to further Edalat's fraudulent activities. It is a mere shell and does not observe any of the corporate formalities. Sentar is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct of Edalat; it is legally therefore one and the same with Paul Edalat; and its actions are the actions of Edalat and Edalat's actions are its actions. It is liable for all the actions done by Edalat because it is his *alter ego*. Edalat is also its agent and the actions alleged in this Second Amended Complaint undertaken by Edalat bind Sentar under the principal and agent and *respondeat superior* doctrines as well as under the *alter ego* doctrine.

17.     Defendant Barghi also acts for and on behalf of Sentar under the direction of Edalat and thus her actions bind Sentar.

18.     Defendant APS Health Sciences, Inc. ("APS") is a Nevada corporation with its headquarters and principal place of business in Irvine, California. Paul Edalat is a co-founder of APS Health Sciences, Inc. and served as a director.

*PLAINTIFFS ALTERNATE HEALTH USA INC., ALTERNATE HEALTH CORP., AND ALTERNATE HEALTH, INC.'S SECOND AMENDED COMPLAINT - Case No. 8:17-cv-1887-CJC-JDE*

8

## JURISDICTION AND VENUE

19.     As a result of the citizenship of each party, this Court has diversity jurisdiction under 28 U.S.C. §1332(a)(1) and (3) because Plaintiff Alternate Health Corp. is a publicly traded corporation incorporated under the laws of Canada with its principal place of business in Canada and is thus a citizen or a subject of a foreign state (Canada) within the meaning of §1332(a)(3); and all the rest of the parties are citizens of different states within the meaning of §1332(a)(1) because Plaintiff Alternate Health USA and Plaintiff Alternate Health, Inc. are both corporations incorporated under the laws of Delaware with their principal places of business in Texas, and thus are citizens of the state of Texas; Defendants Edalat, Karpinski, and Barghi are domiciled in and citizens of the state of California; and Defendants EFT Global Holdings, Inc. ("Sentar") and APS Health Sciences, Inc. ("APS") are both corporations incorporated under the laws of Nevada with each having a principal place of business in Orange County, California; and the amount in controversy, exclusive of interest or costs, exceeds $75,000.

20.     Venue is proper in this District under 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to the claims stated herein occurred within this District, and a substantial part of the property that is the subject of this action is situated here.

## FACTS RELEVANT TO ALL COUNTS

21.     Howard Mann ("Mann"), who was at the time a special advisor to the Board of Directors of AHC, along with other persons from Alternate Health Corp. and Alternate Health USA, including Dr. Michael Murphy, Jim Griffiths, George Mull, and Jim Tykoliz, were introduced to Edalat and Karpinski of Sentar on May 19, 2016 at an event at the "ROC" Business Center at 604 Arizona Avenue in Santa Monica, California, hereinafter referred to as the "May 19, 2016 meeting."

22.     During this May 19, 2016 meeting, as he had done before and would do again in later meetings with any of the Plaintiffs or their representatives, Edalat used the trappings of wealth to convey that he was a successful and wealthy business person. For example, he arrived at the first meeting in a Rolls Royce. Edalat represented that he was the owner of a residence at the prestigious Resort at Pelican Hill in Newport Beach, California. He would again arrive at subsequent meetings in high-priced cars, wearing the finest clothes and watches, and bragging of large business deals and that he was staying in or saying that he was staying in luxury suites. He appeared wearing a diamond-studded gold Rolex watch that he bragged he purchased for more than $50,000.00, and would organize extravagantly fancy dinners and weekend retreats, drive and speak of his ownership of fancy cars, including a Rolls Royce, a Lamborghini, a Land Rover, and a Ferrari, and pretend that he owned and had access to jets because of his wealth. This lifestyle

*PLAINTIFFS ALTERNATE HEALTH USA INC., ALTERNATE HEALTH CORP., AND ALTERNATE HEALTH, INC.'S SECOND AMENDED COMPLAINT* - Case No. 8:17-cv-1887-CJC-JDE

10

presentation is used by Edalat in order to create the false illusion with potential

investors, including Plaintiffs, that he has successfully managed profitable ventures

so that potential investors will be duped into investing with him.

23.    Despite the image created by the trappings of wealth Edalat displayed

at this May 19, 2016 meeting and thereafter, Edalat was in fact a deadbeat. While

parading his lavish lifestyle, he concealed from his potential investors, including

the Plaintiffs, that he is a commercial failure who has filed for personal bankruptcy

three times in the last 20 years; had many liens and judgments filed in Orange

County against his affiliated companies for failing to pay state and federal taxes;

had judgments against him for millions of dollars; and was, at the very time of the

first meeting described just below, in personal bankruptcy and being cross-

examined by the bankruptcy Trustee's counsel about his assets, telling that counsel

that he had very few assets and many more debts.

24.    As of the time of this May 19, 2016 meeting, Edalat had also been

sued in federal court in Orange County by the Food & Drug Administration (the

"FDA") in the case entitled *United States of America v. Scilabs Nutraceuticals,*

*Inc.,* 8:14-cv-01759-JLS-AN, for his repeated failure to comply with the FDA

warnings to him about his and his company's failures to follow FDA safety rules

and his and his company's sale of adulterated food products.  The federal judge

sitting on the case issued a permanent injunction against Edalat and his company,

ordering them not to manufacture or in any way be involved, directly or indirectly, with the manufacture, possession, or distribution of dietary supplements.

25.     During this May 19, 2016 meeting, and without disclosing any of the above-referenced bad financial circumstances that any potential investor or anyone considering doing business with another would want disclosed, Edalat stated that he was involved with a pharmaceutical and nutraceutical company known as Sentar. Edalat told Mann that he and Sentar had patents on an "All Natural Non-Toxic Sublingual Drug Delivery System." He said the patents covered sublingual, dissolvable pills that could be used for delivery of cannabinoids by dissolving them under the tongue. In fact, Sentar did not have "issued patents" as of this date. Edalat and Karpinski also spoke falsely, among other things, about the efficacy of Sentar's patented delivery system, which had been proven highly effective. Like Edalat had done at this May 19, 2016 meeting, Karpinski also stated that Sentar had patents on an "All Natural Non-Toxic Sublingual Drug Delivery System," which had been proven effective.

26.     The representations made by Edalat and Karpinski at this May 19, 2016 meeting about this patent were knowingly false because no such patent had been issued to Sentar and the "delivery system" which Edalat and Karpinski stated to be highly workable and proven was untested and in fact not proven, contrary to what they had represented.

*PLAINTIFFS ALTERNATE HEALTH USA INC., ALTERNATE HEALTH CORP., AND ALTERNATE HEALTH, INC.'S SECOND AMENDED COMPLAINT* - Case No. 8:17-cv-1887-CJC-JDE

12

27.     To demonstrate Sentar's expertise and capabilities at this May 19, 2016 meeting, Edalat and Karpinski showed Mann samples of a generic Viagra product that they claimed to have manufactured. Edalat and Karpinski also showed Mann samples of a CBD pill and said that they had formulated and manufactured the pill. CBD is one of the cannabinoids contained in cannabis. It does not have intoxicating effects like THC, also contained in cannabis.

28.     At this May 19, 2016 meeting, Edalat and Karpinski also claimed, falsely, that Edalat and Sentar had a manufacturing facility which had the capability of mass producing sublingual CBD tablets such as the kind Edalat and Karpinski had told Mann were proven and highly effective, and that Edalat was a world expert in the manufacture of dietary supplements generally, and had a dedicated and experienced staff that he had worked with on the manufacture of dietary supplements successfully for many years. Edalat also said at this May 19, 2016 meeting that transdermal patches for CBD and THC could also be manufactured at Sentar's facility and Sentar would oversee the manufacture.

29.     The patents and manufacturing capability that Edalat and Karpinski discussed during this May 19, 2016 meeting were of great interest to Alternate Health Corp. and Alternate Health USA because these companies and their representatives at this May 19, 2016 meeting had a strong commercial interest in a reliable delivery mechanism for CBD and in a reliable method to manufacture that

*PLAINTIFFS ALTERNATE HEALTH USA INC., ALTERNATE HEALTH CORP., AND ALTERNATE HEALTH, INC.'S SECOND AMENDED COMPLAINT* - Case No. 8:17-cv-1887-CJC-JDE

13

mechanism. As a result, Alternate Health Corp. and Alternate Health USA continued to speak with Sentar regarding a business relationship after the initial meeting at which the above-referenced representations were made by Edalat and Karpinski.

30.     All of the representations made in that first meeting on May 19, 2016 were knowingly false. There was no issued patent for sublingual delivery, such delivery system was not "proven" effective, Edalat and Karpinski had no proven manufacturing facility capable of manufacturing these sublingual pills or other related products as represented, nor were they well-versed in the FDA requirements for doing so correctly.

31.     Moreover Edalat and Karpinski failed to disclose during that May 19, 2016 meeting, or afterward, any of Edalat's or Sentar's bad financial conditions and circumstances, or any of the debts, liens or judgments against him, nor that the FDA, far from being an agency with which he had good relations, had in fact sued Edalat and caused one of his companies to be shut down because of his repeated failures to heed FDA warnings about his repeated manufacture and public delivery of adulterated food products, in violation of federal law and FDA health standards.

32.     Around this same time, on May 20, 2016, Karpinski, in concert with Edalat, sent Mann, who was acting as she well knew as a representative of Plaintiffs, an email that attached a Sentar presentation entitled "Patented

Technology." Edalat created this in combination with Farah Barghi, or directed the creation of this document by her, and likewise Edalat directed that Karpinski provide this document to Plaintiffs. This presentation contained numerous material falsehoods, and omitted material facts needed to render statements not misleading. These included:

(i)     the presentation stated that Sentar had "tightly controlled intellectual property surrounding its patented delivery system," but did not state that Sentar did not actually have patents for its technology;

(ii)     the presentation also falsely claimed that "Sentar Pharmaceuticals' intellectual property included a novel, patented delivery system designed for application to many pharmaceutical compounds," even though Sentar had no such patent, as all Defendants well knew;

(iii)     the presentation also falsely stated that "Sentar's novel intellectual property is globally protected both in the United States and globally" when Defendants well knew of its falsity because they knew Sentar possessed no such patent;

(iv)     the presentation falsely stated that Sentar uses "a stringently regulated manufacturing process," which "assures the production of safe, secure products, guaranteed to be of the highest quality," which was not true, because the

*PLAINTIFFS ALTERNATE HEALTH USA INC., ALTERNATE HEALTH CORP., AND ALTERNATE HEALTH, INC.'S SECOND AMENDED COMPLAINT - Case No. 8:17-cv-1887-CJC-JDE*

15

manufacturing system was not operational and had not been subjected to regulation, as Defendants well knew;

(v)     the presentation falsely asserted that Sentar had "25 years of experience in nutraceutical and pharmaceutical manufacturing under strict regulation by the United States Food and Drug Administration (FDA)," a statement that was knowingly false because it omitted the fact that Edalat had actually been warned repeatedly by the FDA about his distribution of adulterated products and also failed to inform Plaintiffs of the injunction that the FDA had obtained against him and a company under his control after he had refused to comply with the FDA warnings about his distribution of adulterated food products;

(vi)     the presentation also falsely stated that "Sentar's model demands the highest quality of finished goods before they are available on the market. We achieve this by adhering to stringent guidelines for quality by the FDA and following current good manufacturing process (cGMP) from raw material sourcing to finished product;"

(vii)   the presentation stated falsely that "[a]ll materials sourced by Sentar are approved, tested and manufactured by Sentar's approved FDA licensed, cGMP manufacturing partners;"

(viii)  while making the above-stated, favorable references to the FDA in the presentation, and thus leaving the assurance that Edalat and Sentar were competent

and successful in dealing with the FDA, a highly important federal regulator in the business activities in which Sentar was claiming success, the presentation did not disclose the injunction that the U.S. District Court for the Central District of California had entered against Edalat and one of his entities as a result of a lawsuit filed by the FDA, or that the FDA had repeatedly warned Edalat about his failing to comply with FDA regulations, or that Sentar had no manufacturing capability or means to achieve that capability, all of which shortcomings were well known to Edalat, Karpinski, and Barghi. And while stating all the successful financial and commercial relationships supposedly enjoyed by Sentar all over the world, the presentation failed to say anything about Edalat's bad financial conditions, liens and judgments against him, or his three personal bankruptcies.

33.     The false and misleading statements from the presentation were a material cause of the entry by Plaintiffs into the agreements described below with Defendants, the issuance of the stock by Plaintiffs to Defendants, and the payment of money by Plaintiffs to Edalat.

34.     Moreover, by or about May 27, 2016, Mann and others representing Plaintiff Entities, including James Tykoliz, visited Edalat's manufacturing facility at 17809 Gillette Avenue in Irvine, California ("Gillette Avenue Manufacturing Facility"). Edalat, Karpinski, and Barghi were present. During this visit, Edalat again spoke to the group about his and Sentar's manufacturing capability for CBD

*PLAINTIFFS ALTERNATE HEALTH USA INC., ALTERNATE HEALTH CORP., AND ALTERNATE HEALTH, INC.'S SECOND AMENDED COMPLAINT* - Case No. 8:17-cv-1887-CJC-JDE

17

sublingual tablets and said that the CBD transdermal patches could also be manufactured at the Gillette Avenue Manufacturing Facility. Edalat told the group that he would be able to make one million pills each day. This was false as Edalat, Karpinski and Barghi well knew because the manufacturing facility had never made anything more than a sample of pills, was not licensed to do so, and did not have the capacity to do so.

35.     During another visit to the Gillette Avenue Manufacturing Facility on or about June 25, 2016, Karpinski told Walter Grieves, Stephen Bugbee and Howard Mann, all then representatives of the Plaintiff Entities, and also told other persons visiting from Canada who were there as representatives as well, that Sentar had everything in place to manufacture sublingual CBD tablets. At a lunch later that same day at The Resort at Pelican Hill, Edalat falsely claimed he was an expert in the manufacture of nutraceuticals yet failed to tell them that he was subject to a court order prohibiting him from such manufacture.

36.     On June 27, 2016, Edalat sent an email to Barghi, copying Karpinski and Mann, requesting that Barghi "Please send Howard our Sentar patents for the licensing contract with alternate health" [sic], and both Karpinski and Barghi each separately responded by emailing to Mann, then representing the Plaintiff Entities, a chart listing nine different patents that they all claimed were owned by Sentar. This patent list (attached to this Second Amended Complaint as Exhibit F) was

material to the entry into any of the agreements because it indicated that Edalat and Sentar indeed controlled a significant number of valuable patents when in truth, as was well known to all Defendants, the patents on that list were not issued and were otherwise not valuable, contrary to what had been represented.

37.     During a July 11, 2016 meeting at the "ROC" business center attended by Howard Mann as a representative of the Plaintiff Entities, Amir Asvadi, Walter Grieves, and Tony Sanchez, Jr., the President of the Seminole Tribe of Florida, Inc., Edalat falsely repeated his statement described above that he and Sentar had the ability and expertise to manufacture, package, and distribute sublingual tablets with CBD.

38.     During a lunch meeting with Amir Asvadi, who at the time was a potential investor in Sentar, and Howard Mann, who was then representing the Plaintiff Entities, held in Long Beach on July 15, 2016, Edalat again falsely stated that he and Sentar could manufacture sublingual CBD tablets and they, as well as transdermal patches, could be manufactured at the Gillette Avenue Manufacturing Facility. He also said that he and Sentar were on the verge of obtaining issued patents for CBD transdermal patches. This statement was false, as Edalat well knew, and such patents were not thereafter issued as promised.  During a subsequent meeting with the then-former chief of the Seminole Nation, Greg Chilcoat, Edalat falsely boasted that he and Sentar had the ability and expertise to

manufacture, package, and distribute sublingual tablets with CBD which, as he well knew then and there, was false for the reasons explained above in this Second Amended Complaint.

39.     Edalat also told representatives of the Plaintiff Entities, falsely, that he was the world's leading expert on nutraceuticals, doing so during a meeting in the conference room of the Gillette Avenue Manufacturing Facility in or about April 2017. Howard Mann, Stephen Bugbee, George Mull, and foreign visitors who were touring the facility attended the meeting.

40.     Edalat made a statement similar to the one referred to in paragraph 39 during a June, 2017 meeting in Venice, California attended by Howard Mann, George Mull, Dr. Murphy, Dr. Jamison Feramisco, and Jade Green, all representatives at that time of the Plaintiff Entities.

41.     As a result of and because they were induced by the false representations, promises, pretenses and omissions described in paragraphs 22 through 40 above, all made in the manner and at the time and place described above by Edalat, Barghi, and Karpinski on their own behalf and on behalf of Sentar, the Plaintiff Entities entered into various agreements with various of the Defendants and took certain other actions described below. None of these agreements or the other actions would have been entered into or taken by any of the Plaintiffs but for the false representations, promises, pretenses and omissions

described in paragraphs 22 through 40 above. Each of these agreements and other actions taken are separately described below.

42.    **The Consulting Agreement.** The Consulting Agreement was made effective on January 9, 2017, and was entered into between Edalat on the one hand and Alternate Health Corp. and Alternate Health USA on the other. A copy of it is annexed as Exhibit A hereto and adopted herein by reference as if repleaded in its entirety in this Second Amended Complaint. Under its terms, Edalat was "retained . . . as an advisor and consultant to" Alternate Health Corp. and Alternate Health USA "for the development and refinement of the Technology and related products." Ex. A at § 1.1. "Technology" was defined as "sublingual delivery system technology regarding THC, CBD and other compoundable nutraceutical products." *Id.* at Recitals, subheading A.

43.    Edalat also agreed under this Consulting Agreement to provide "advice, counsel and assistance" when reasonably requested by Alternate Health Corp. or Alternate Health USA "in connection with (i) further research and development with respect to the Technology, (ii) the development and commercialization of products and services based on the Technology, and (iii) assistance in procuring regulatory approvals and permits relating to any such products." *Id.* at § 1.1. Edalat also agreed under the Consulting Agreement to

*PLAINTIFFS ALTERNATE HEALTH USA INC., ALTERNATE HEALTH CORP., AND ALTERNATE HEALTH, INC.'S SECOND AMENDED COMPLAINT - Case No. 8:17-cv-1887-CJC-JDE*

21

facilitate patents for and the introduction (*i.e.*, manufacture) of additional CBD and THC infused patch products.

44.     Plaintiffs all believed that Edalat had the capability to carry out the promises he made and the obligations he undertook under the Consulting Agreement because of the false representations, promises, pretenses and omissions described above.

45.     In exchange for his obligations described above in the Consulting Agreement, Edalat was to receive, and did receive (because unlike Edalat, Barghi, and Karpinski, Plaintiffs honored their promises): (i) 325,000 common shares of Alternate Health Corp. "with a deemed value of $1.00 per share" at the time the Consulting Agreement was executed; (ii) "Common Stock of Alternate Health Corp. with an aggregate value of US$1,150,000, based on a valuation of C$1.00 per share, or 1,293,506 shares"; and (iii) "500,000 common shares of Alternate Health Corp., based on a valuation of C$1.00 per share, as a commission for facilitating the transdermal patent and for the introduction to additional CBD & THC infused patch products." *Id.* at §§ 2.1(a), 2.1(b), and 2.1(c).

46.     The Consulting Agreement further provided, on the assumption that Edalat had not fraudulently induced Alternate Health Corp. and Alternate Health USA to enter into the Agreement and therefore had the right to receive shares thereunder, that "portions of the shares (common stock) otherwise payable to

*PLAINTIFFS ALTERNATE HEALTH USA INC., ALTERNATE HEALTH CORP., AND ALTERNATE HEALTH, INC.'S SECOND AMENDED COMPLAINT* - Case No. 8:17-cv-1887-CJC-JDE

22

[Edalat] may be assigned to third parties as directed in writing by the Consultant [*i.e.*, Edalat] prior to listing." *Id.* at § 3.3. On January 9, 2017, Edalat invoked this assignment provision of the Consulting Agreement and caused to have assigned 480,000 of his allotted shares to six individuals. *Id.* at 5 (Addendum to Consulting Agreement found at Exhibit A hereto). Those who received shares under this assignment by Edalat included 50,000 of common shares to Defendant Barghi and 15,000 common shares to Defendant Karpinski.

47.     All of the shares issued to Edalat, including all those assigned by him to Barghi and Karpinski, were issued by Alternate Health Corp. as a result of the false representations, promises, pretenses and omissions described above, were issued in reliance upon those false representations, promises, pretenses and omissions, and would not have been issued but for them.

48.     In total, and as formally issued to him on February 22, 2017, Edalat was issued a total of 1,638,506 shares, Barghi was issued a total of 50,000 shares and Karpinski was issued a total of 15,000 shares.

49.     **The Sublingual Licensing Agreement**. On January 9, 2017, contemporaneously with the Consulting Agreement described above, a Sublingual Licensing Agreement was entered into between Sentar on the one hand and Alternate Health Corp. and Alternate Health USA on the other. A copy of it is

*PLAINTIFFS ALTERNATE HEALTH USA INC., ALTERNATE HEALTH CORP., AND ALTERNATE HEALTH, INC.'S SECOND AMENDED COMPLAINT* - Case No. 8:17-cv-1887-CJC-JDE

23

annexed as Exhibit B hereto and adopted herein by reference as if repleaded in its entirety in this Second Amended Complaint.

50.     Under its terms this Sublingual Licensing Agreement, among other things, granted Alternate Health Corp. and Alternate Health USA an "exclusive license for the use of CBD and THC . . . and other compoundable nutraceutical products [i.e., dietary supplements] in tablet form . . . under Licensor Patent Rights, in jurisdictions where Licensor Patent Rights exist, to make, have made and/or sell Licensed Products in a Licensor facility or another facility approved by [Sentar], using and practicing the Licensed Method and Licensed Process [Sentar's manufacturing process] in the Field of Use Permitted under the terms herein and subject to the limitations set forth under this [License] Agreement." *Id.* at § 2.1. The Sublingual License Agreement's Exhibit A, titled "Licensor Patent Rights," lists ten applications by client matter number, title, and application serial number and also states Sentar "has U.S. Provisional patent applications extending sublingual delivery systems into CBD and THC related areas." *See id.* at Ex. A thereto. These patent rights and descriptions of them are the same in substance as were the descriptions of the patents in the patent list sent by both Barghi and Karpinski separately to the Plaintiff Entities by email on June 27, 2016, as described in paragraph 36 hereof. As alleged above, none of these patents had been

issued as described on the list sent to Plaintiff Entities by Barghi and Karpinski and none had the value purported by the list.

51.    The relevant terms defined in the License Agreement include the following:

(i)    "Licensed Products" is defined as "an article, composition, substance or chemical that has been manufactured in a facility that has been approved by [Sentar] in a tablet form that utilizes the sublingual delivery system under the Licensed Method and Licensed Process that is covered by Licensor Patent Rights, whose manufacture, reproduction, display, use or sale would, but for the license granted under this Agreement, constitute an infringement, inducement of infringement or contributory infringement of any claim within Licensor Patent Rights, or any article, composition, chemical, substance or any other material made, used, sold by, utilizing or practicing the Licensed Method in the Field of Use." *Id*. at § 1.5.

(ii)    "Licensed Method" is defined as "the sublingual process, art, service or method covered by Licensor Patent Rights in the Field of Use granted in the Agreement but for the license granted under this Agreement, would constitute an infringement, inducement of infringement or contributory infringement of any claim within Licensor Patent Rights." *Id*. at § 1.

(iii)    "Licensed Process" is defined as "the sublingual process for manufacturing tablets in the Field of Use in a Sentar facility (or another facility approved by [Sentar]), which, in the course of being practiced, would be within the scope of one or more claims of the Licensor Patent Rights that claims that are held or otherwise are valid." *Id*. at § 1.5.

(iv)    "Field of Use" is defined as "sublingual delivery systems, including CBD and THC and other compounding nutraceutical products (non-pharmaceutical) in tablet form only, under the Licensor Patent Rights." *Id*. at § 1.2.

*PLAINTIFFS ALTERNATE HEALTH USA INC., ALTERNATE HEALTH CORP., AND ALTERNATE HEALTH, INC.'S SECOND AMENDED COMPLAINT - Case No. 8:17-cv-1887-CJC-JDE*

25

(v)    The rights under the License Agreement are restricted to "jurisdictions where Licensor Patent Rights exist, to make, have made and/or sell Licensed Products . . . ." *Id*. at § 2.1.

(52)    The parties to the Sublingual License Agreement agreed to "comply with all applicable international, national, state, regional, and local laws and regulations in performing its obligations hereunder and in its use, manufacture, sale or import of the Licensed Products or practice of the Licensed Methods." *Id.* at § 23.

(53)    In exchange for the promises relating to the patent rights alleged above, Alternate Health Corp. and Alternate Health USA agreed to and did pay Sentar: (i) 650,000 common shares of Alternate Health Corp., "with a deemed value of $1.00 per share," within 30 days of the execution of the Sublingual License Agreement; and (ii) an additional 200,000 common shares of capital stock of Alternate Health Corp. "based on a valuation of C$1.00 per share" within 30 days of executing the Sublingual License Agreement. *Id.* at § 3.1.

(54)    On February 22, 2017, Alternate Health Corp.'s Board of Directors approved the issuance of 850,000 shares to Sentar pursuant to the License, doing so because it, along with all the Plaintiffs, believed the false representations, promises, and pretenses described in paragraphs 22 through 40 above and did not know of the facts omitted.

*PLAINTIFFS ALTERNATE HEALTH USA INC., ALTERNATE HEALTH CORP., AND ALTERNATE HEALTH, INC.'S SECOND AMENDED COMPLAINT* - Case No. 8:17-cv-1887-CJC-JDE

26

(55)   After the Sublingual License Agreement went into effect, Alternate Health Corp. and Alternate Health USA devoted significant time, money, and resources to performing their obligations under the License Agreement. They built a website for the sublingual tablet product, hired a production team, formulated a marketing and distribution plan, wrote advertisements, worked on packaging for the tablets to be marketed under the license conveyed, set up meetings with potential distributors, created and funded a hemp facility to obtain the CBD product to be marketed under the license, set up interim sourcing for CBD, supported clinical studies on individuals with the Zika virus, and entered into discussions with Canadian licensed providers about manufacturing and delivery in the Canadian market.

(56)   **The Manufacturing Agreement**. The Manufacturing Agreement was made effective on January 16, 2017, and was entered into between Sentar on the one hand and Alternate Health USA on the other. A copy of it is annexed as Exhibit C hereto and adopted herein by reference as if repleaded in its entirety in this Second Amended Complaint. The Manufacturing Agreement specified that Alternate Health USA would pay Sentar $150,000 in exchange for the production of a yet-to-be-determined amount of tablets from "approximately 1 kilo of Raw Material" to be supplied by Alternate Health USA. *Id.*

*PLAINTIFFS ALTERNATE HEALTH USA INC., ALTERNATE HEALTH CORP., AND ALTERNATE HEALTH, INC.'S SECOND AMENDED COMPLAINT* - Case No. 8:17-cv-1887-CJC-JDE

27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(57)   **Pet Products License Agreement.** During early 2017, Edalat frequently complained to Plaintiffs about the high costs associated with the Gillette Avenue Manufacturing Facility in Irvine, California and stated that he needed funds to keep the facility open. Alternate Health looked for an opportunity to provide him with revenue to ensure the manufacturing facility would remain open and available to manufacture sublingual pills as Edalat had stated that he could and the Sublingual License Agreement and Manufacturing Agreement described above obligated him to do. Edalat's complaints about needing money were completely at odds with the rich lifestyle he had led Plaintiffs to believe he enjoyed, and with the business successes that he had represented to have achieved.

(58)   Nonetheless, because Plaintiffs had invested so many resources into their agreements with Edalat and Sentar and in order to generate the money Edalat was at this point professing to need, on May 1, 2017, Plaintiff Alternate Health Inc. entered into the Pet Products License Agreement with Defendant APS. A copy of it is annexed as Exhibit D hereto and adopted herein by reference as if repleaded in its entirety in this Second Amended Complaint. This Agreement specified that APS would license to Alternate Health USA three (3) pet products infused with CBD. See, Ex. D (Pet Products License Agreement) at Ex. A thereto. APS was founded by Edalat and Barghi, both served as directors of APS, and Edalat represented that it was one of his companies.

(59)   The Pet Products License Agreement also granted Alternate Health, Inc.  the "exclusive license for the use of [Sentar's] formulations developed for the health and wellness of pets, specifically canines, and for [Sentar's] development of specialty pet product formulas utilizing CBD . . . for distribution and sale by Alternate Health Inc. *Id.* at § 2.1.

(60)   In consideration for the Pet Products License Agreement, Alternate Health Inc. agreed to pay APS $350,000 at the time of the Pet Products License Agreement (*Id* at § 3.1) and did pay an initial deposit of $30,000 to Sentar when the Pet Products License Agreement was executed. *Id*. at § 3.2. On May 4, 2017, Alternate Health Inc. paid an additional $320,000 to Sentar by wire transfer.

## The Discovery of Defendants' Deceit

(61)   On multiple occasions in 2017, after the Consulting, Licensing, and Manufacturing Agreements described above had been executed, the Plaintiff Entities contacted Sentar to request it take steps to move forward with the commercial manufacture of CBD sublingual tablets as provided for in the Agreements. Sentar, speaking through Edalat and Karpinski, repeatedly came up with excuses for why it could not commence manufacture, raising excuses and offering reasons that had not been mentioned before the Agreements were entered when, instead of these reasons being offered for their refusal to honor their

*PLAINTIFFS ALTERNATE HEALTH USA INC., ALTERNATE HEALTH CORP., AND ALTERNATE HEALTH, INC.'S SECOND AMENDED COMPLAINT* - **Case No. 8:17-cv-1887-CJC-JDE**

29

promises, Defendants were representing how capable they were of prompt and abundant CBD pill and patch manufacture.

(62)   Then, commencing in June 2017, Alternate Health Corp., Alternate Health USA, and Alternate Health, Inc. through their representatives, learned of many facts that showed that they had been defrauded by Plaintiffs Edalat, Karpinski, Barghi, and Sentar, including the ones stated in paragraphs 64 through 69 below. All of the matters discovered below were learned by Plaintiffs after all the above-described agreements were entered into and all the above-described stock shares were issued, none of which would have occurred had the facts described in paragraphs 63 through 73 below been known.

(63)   Plaintiffs discovered that while Edalat and Karpinski had been showing Plaintiffs a lavish and wealthy lifestyle and representing to Plaintiffs that Edalat was a successful businessperson, all during the time period from May, 2016 through February, 2017, Edalat was in a personal bankruptcy proceeding he had filed in July, 2014 in which he had filed sworn statements about his debts and liabilities showing that he was without funds or other assets and, far from the successful and wealthy business person Defendants had made Edalat appear to be, he was a complete financial failure. Plaintiffs also learned, and this furthered the showing of Edalat's complete business failures and complete lack of reliability as a

business co-venturer, that Edalat had many debts, liens, and judgments filed

against him and his companies that he had not paid despite his knowledge of them.

(64)    Plaintiffs also discovered that Edalat had filed personal bankruptcy

twice before 2014, first in 1998 and again in 2005, both times swearing under oath

that he had more debts than assets, could not pay his debts, and was insolvent, and

these bankruptcies showed that he had for decades been a commercial failure and a

completely unreliable person with whom to enter into any business agreement.

(65)    Thereafter Plaintiffs also learned, despite all the claims by Edalat,

Karpinski and Barghi about the long success of Edalat and Sentar with the FDA,

that, on November 12, 2014, in a lawsuit brought by the FDA under the caption

described in paragraph 24 of this Second Amended Complaint, a federal court had

ordered ("Court Order") an Edalat-controlled company, Scilabs Nutraceuticals,

Inc., along with Edalat himself, to shut down, cease all of their operations, and

destroy all of their existing products because they had failed to comply with FDA

good manufacturing practices and because Edalat had ignored repeated warnings

from the FDA about their failures to do so.

(66)    The Court Order described above remains in effect.  A true and correct

copy of the Court Order is attached as Exhibit E. This Court Order precluded many

of the activities that Defendants promised Plaintiffs under the agreements described

above.  The existence of this Court Order also showed that Edalat, Karpinski, and

Barghi were not worthy of belief since they had concealed such a highly-relevant

Order restraining them from doing many of the activities they had represented to

Plaintiffs they could and would do. The Court Order specifically states that Edalat,

Scilabs Nutraceuticals, Inc.:

> . . . and each and all of their directors, officers, agents, representatives, employees, attorneys, successors and assigns, and any and all persons or Entities in active concert or participation with any of them who have received actual notice of this Decree by personal service or otherwise, are permanently restrained and enjoined under 21 U.S.C. § 332(a), and the equitable authority of this Court, from directly or indirectly manufacturing, preparing, packing, labeling, holding, or distributing any dietary supplements, at 17809 Gillette Avenue, Irvine, California 92614-6501, or at or from any other locations at which Defendants now, or in the future, directly or indirectly manufacture, prepare, pack, repack, label[,] hold, and/or distribute dietary supplements" unless they fulfilled certain onerous conditions, which they never fulfilled.

Ex. E (Court Order, ¶ 5). The discovery by Plaintiffs of this Court Order disclosed to

Plaintiffs that they could never trust Edalat as a business co-venturer generally

because he had concealed this legal proceeding from them and that they could not

trust him as a consultant, as he had induced them to agree to do and to pay to do in

the Consulting Agreement referred to above.

     (67)   Moreover, Plaintiffs also learned that neither Edalat nor Sentar had the

capability to manufacture either pills or transdermal patches in the manner, quality,

and in the volume Defendants had represented, nor the pet-infused products

designed for pet consumption.

*PLAINTIFFS ALTERNATE HEALTH USA INC., ALTERNATE HEALTH CORP., AND ALTERNATE HEALTH, INC.'S SECOND AMENDED COMPLAINT* - **Case No. 8:17-cv-1887-CJC-JDE**

32

(68)   Plaintiffs also learned that the Sentar patents supposedly issued and effective worldwide were not thus effective and indeed many of them were not issued at all and not patentable; and therefore that the License Agreement predicated on Plaintiffs' obtaining an exclusive license world-wide for the patent rights conveyed by that License Agreement in fact conveyed nothing like what had been represented by Defendants and therefore was of no value to Plaintiffs.

**FIRST CAUSE OF ACTION: FRAUD IN THE INDUCEMENT**
**(Seeking Rescission of Agreements as Against Defendants Edalat and Sentar**
**and of Issuance of All Stock Issued to Defendants)**

(69)   Plaintiffs hereby incorporate all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

(70)   Beginning on or around May 19, 2016 and continuing until after the agreements referred to above were entered into, Defendants Edalat, Karpinski, and Barghi, acting for themselves and for Sentar and APS, falsely and knowingly represented the many material facts referred to in paragraphs 22 through 41 of this Second Amended Complaint.  These representations are now, and were when made, false, and these Defendants knew them to be false at the time these representations were made.

(71)   Beginning on or around May 19, 2016, and continuing until after the agreements referred to above were entered into, Defendants Edalat, Karpinski, and Barghi, acting for themselves and for Sentar and APS, concealed and failed to

disclose the facts described above in paragraphs 22 through 41 of this Second

Amended Complaint, which materially qualified the facts disclosed, or which

rendered the disclosure likely to mislead.

(72)   Edalat, Karpinski, and Barghi made these misrepresentations and

concealed and failed to disclose these material facts intentionally, or in reckless

disregard of the truth, with the intent to induce Alternate Health Corp., Alternate

Health USA, and Alternate Health, Inc. to enter into the agreements referred to

above that were lucrative for Edalat and Sentar, including the Consulting

Agreement, the Sublingual License Agreement, the Manufacturing Agreement, and

the Pet Products License Agreement.

(73)   In entering into the Consulting Agreement, the Sublingual License

Agreement, the Manufacturing Agreement, and the Pet Products License

Agreement, all referred to above, Alternate Health Corp., Alternate Health USA, and

Alternate Health, Inc., were not aware of the falsity of the above-described

representations made by Edalat, Karpinski, and Barghi on their own behalf and on

behalf of Sentar, and were likewise not aware of the existence of the concealed and

omitted material facts described above, which Edalat, Karpinski, and Barghi, on

their own behalf and on behalf of Sentar, failed to disclose and intentionally

concealed.

(74)   Alternate Health Corp., Alternate Health USA, and Alternate Health, Inc., reasonably relied on these misrepresentations and upon the absence of the omitted facts in entering into the Consulting Agreement, the Sublingual License Agreement, the Manufacturing Agreement and the Pet Products License Agreement. Alternate Health would not have entered into these Agreements had they been aware of these misrepresentations and concealments.

(75)   As a direct and proximate cause of these misrepresentations and omissions and of the reliance thereon by Alternate Health Corp., Alternate Health USA, and Alternate Health, Inc., they entered into the Consulting Agreement, the Sublingual License Agreement, the Manufacturing Agreement, and the Pet Products License Agreement when they otherwise would not have done so. Alternate Health Corp. also issued 2,118,506 shares (valued at C$2.00 Canadian Dollars per share on the Canadian Securities Exchange as of closing on December 13, 2017, which is $3,306,055.72 United States Dollars using the current exchange rate as of December 13, 2017) to Edalat and his assignees pursuant to the Consulting Agreement, shares that would not have been issued had the misrepresentations not been made and the omitted facts been disclosed by Defendants.  Additionally, Alternate Health Corp. would not have issued 850,000 shares to Sentar pursuant to the Sublingual License Agreement, nor paid expenses to perform under the Sublingual License Agreement, nor paid $350,000 to APS and Edalat under the Pet Products License

Agreement, nor would they have incurred expenses to perform under the Pet Products License Agreement had the above-described misrepresentations not been made by Defendants and the omitted facts been disclosed by Defendants.

(76)   Defendants' reliance on these representations and omissions was a substantial factor in causing them to enter into the agreements described above, issue the stock shares described above, pay the money described above, and incur the additional expenses described above.

(77)   It is possible, through rescission, to place all the parties back to the position they were in before the fraud described in paragraphs 22 through 41. No Plaintiff received any financial or other consideration under any of the Agreements sought to be rescinded and any alleged services Defendants performed were of no value, in large part because of the fraudulent misrepresentations and the deceptive omissions alleged paragraphs 22 through 41.

(78)   Alternate Health Corp. and Alternate Health USA are (i) entitled to rescission of the Consulting Agreement, (ii) entitled to the return of the 2,118,506 shares issued to Edalat and return of those assigned by him to Karpinski and Barghi pursuant to the Consulting Agreement, (iii) entitled to rescission of the Sublingual License Agreement, (iv) entitled to return of  the 850,000 shares issued to Sentar pursuant to the Sublingual License Agreement, and Alternate Health, Inc. is (v)

*PLAINTIFFS ALTERNATE HEALTH USA INC., ALTERNATE HEALTH CORP., AND ALTERNATE HEALTH, INC.'S SECOND AMENDED COMPLAINT - Case No. 8:17-cv-1887-CJC-JDE*

36

entitled to rescission of the Pet Products License Agreement, and (vi) entitled to return of the $350,000.00 paid under that agreement.

### SECOND CAUSE OF ACTION: FRAUD AND DECEIT
### (Under California Civ. Code §§1709 and 1572)
### (All Defendants)

(79)   Plaintiffs hereby incorporate all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

(80)   Defendants Edalat, Karpinski,  Barghi, and Sentar, for whom these three individual defendants were acting and for which they were speaking, repeatedly made intentionally false statements to the individual plaintiffs, in the manner alleged above at paragraphs 22 through 41 of this Second Amended Complaint, including affirmative false statements as therein described, all of which were either knowingly false when made by defendants Edalat, Karpinski, and Barghi, or those defendants had no reasonable ground for believing these statements were true, or were promises made without any intention of performing them.

(81) Edalat, Karpinski, and Barghi intended that the individual plaintiffs rely on the false statements. Plaintiffs justifiably relied on the false statements described above in deciding to enter into the agreements referred to above, issue the stock referred to above, and spend the money referred to above.

(82) Defendants' intentional false statements violate California Civil Code sections 1709 and 1572 and have caused Plaintiffs damages, including lost revenues, income, and investment monies in an amount to be proved at trial. Through their actions, Defendants intended to cause Plaintiffs injury and carried on their actions with willful and conscious disregard of the rights of the plaintiffs.

(83)   As a direct and proximate result of the defendants' wrongful conduct, the individual plaintiffs suffered damages to be proved at trial in amount totaling at least $4,000,000.00.

(84) The statements were made by Edalat, Karpinski, and Barghi with oppression, fraud and malice and with the intent to injure Plaintiffs and thus these Defendants should pay punitive or exemplary damages to Plaintiffs in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### Fraud by Concealment under California Civ. Code §§1710 and 1573)
### (All Defendants)

(85)   Plaintiffs hereby incorporate all of the allegations set forth in the preceding paragraphs as if fully set forth herein.

(86) Defendants Edalat, Karpinski, and Barghi repeatedly and intentionally concealed and/or suppressed material facts, as alleged in paragraphs 22 through 41 of this Second Amended Complaint, which Defendants had a duty to disclose to

the individual plaintiffs when seeking to obtain money, stock and business promises from Plaintiffs.

(87) Defendants intentionally concealed and/or suppressed the facts alleged herein with the intent to defraud Plaintiffs by inducing them to rely on the materially misleading information provided by Defendants.

(88) Plaintiffs were unaware of the omissions and concealed facts at the time of their entry into the Agreements referred to above, when they issued the shares of stock referred to above, and when they paid the sums of money referred to above.

(89) By their concealment, Defendants have violated California Civil Code sections 1710 and 1573 and, as a result, the Plaintiffs have suffered damages, including lost revenues, income, and other assets in an amount to be proved at trial.

(90) As a direct and proximate result of Defendants' wrongful conduct, the plaintiffs suffered damages in an amount to be proved at trial, totaling at least $4,000,000.00.

(91) The omissions described above were concealed by Edalat, Karpinski, and Barghi with oppression, fraud and malice and with the intent to injure Plaintiffs and thus these Defendants should pay to Plaintiffs punitive or exemplary damages in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, and each of them, respectfully demand relief as follows:

A. A determination by this Court that Alternate Health Corp. and Alternate Health USA are entitled to a rescission of the Consulting Agreement, and that Edalat must return the 2,118,506 shares of AHC stock he received pursuant to the Consulting Agreement;

B. The imposition of a constructive trust over the 2,118,506 shares of AHC stock provided to Edalat pursuant to the Consulting Agreement;

C. A determination that Alternate Health Corp. and Alternate Health USA are entitled to a rescission of the Sublingual License Agreement, are no longer obligated to fulfill any of their prior promised performance and obligations, or any subsequent obligations; and that Sentar must return the 850,000 shares it received pursuant to the Sublingual License Agreement;

D. A determination that Alternate Health, Inc. is entitled to a rescission of the Pet Products License Agreement and is no longer obligated to fulfill any of its prior promised performance and obligations, or any subsequent obligations; and that APS must return the $350,000 it received from Plaintiffs under the Pet Products License Agreement;

E.  The imposition of a constructive trust over the 850,000 shares of Alternate
Health stock provided to Sentar pursuant to the Sublingual License
Agreement, and over the $350,000 paid to APS pursuant to the Pet Products
License Agreement;

F.  Compensatory and consequential damages in an amount to be proven at trial;

G.  Punitive damages;

H.  An award of all taxable costs allowable;

I.  Pre-judgment and post-judgment interest as provided by law;

J.  An award of attorneys' fees and costs; and

K.  Such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury on all issues so triable pursuant to
Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: December 6, 2018                     Respectfully submitted,

                                            MARKHAM & READ

                                            By: */s/ John J. E. Markham, II*
                                                John J. E. Markham, II

*PLAINTIFFS ALTERNATE HEALTH USA INC., ALTERNATE HEALTH CORP., AND ALTERNATE HEALTH, INC.'S SECOND AMENDED COMPLAINT* - Case No. 8:17-cv-1887-CJC-JDE

41

## CERTIFICATE OF SERVICE

Commonwealth of Massachusetts, County of Suffolk

I am employed in the county and state aforesaid. I am over the age of 18 and not a party to the within action.  My business address is One Commercial Wharf West, Boston, Massachusetts  02110.

On the date set forth below, I served the foregoing document described as:

**Plaintiff Alternate Health USA Inc., Alternate Health Corp., and Alternate Health, Inc.'s  Second Amended Complaint**

**[X] BY CM/ECF FILING SYSTEM on**:

Saied Kashani, Esquire *via saiedkashani@gmail.com*
800 West First Street, Suite 400
Los Angeles, California 90012
*Counsel for Defendants Paul Edalat and*
*EFT Global Holding, Inc. dba Sentar*

David S. Alverson *via dalverson@lesnickprince.com*
Lesnick Prince & Pappas LLP
315 W. Ninth St., Suite 705
Los Angeles, CA  90015
*Attorneys for Counter Defendant*
*Computershare Investor Services Inc.*

I declare under penalty of perjury under the laws of United States and the State of California that the above is true and correct.

Executed on December 11, 2018 in Boston, Massachusetts.

 */s/ Bridget A. Zerner*
Bridget A. Zerner