1  SAIED KASHANI, SBN 144805
2  800 West First Street Suite 400
   Los Angeles, CA  90012
3  tel. (213) 625 4320
4  saiedkashani@gmail.com

5  Attorneys for Defendants and Counterclaimants,
6  PAUL EDALAT and EFT GLOBAL HOLDINGS INC.
   dba SENTAR PHARMACEUTICALS
7
                    UNITED STATES DISTRICT COURT
8
                   CENTRAL DISTRICT OF CALIFORNIA
9
                          SOUTHERN DIVISION
10

11

12  Alternative Health USA Inc., and      Case No. 8:17-cv-01887-CJC (JDEx)
    Alternate Health Corp.,
13                                         Assigned to the Honorable Cormac J.
14              Plaintiffs,                Carney

15         v.                             **THIRD AMENDED**
16                                        **COUNTERCLAIM OF PAUL**
    Paul Edalat,                          **EDALAT AND EFT GLOBAL**
17                                        **HOLDINGS INC. FOR:**
18              Defendant.
19                                        **1. FRAUD**
    Paul Edalat, EFT Global Holdings Inc. **2. NEGLIGENT**
20                                        **MISREPRESENTATION**
21              Counterclaimants          **3. BREACH OF CONTRACT**
                                          **4. REFUSAL TO REGISTER**
22         v.                             **TRANSFER OF SECURITIES**
23  Alternative Health USA Inc., Alternate **5. DECLARATORY RELIEF**
24  Health Corp., Howard Mann, Michael L. **6. BREACH OF FIDUCIARY**
    Murphy, M.D, and Computershare        **DUTY**
25  Investor Services, Inc.,              **7. ALTER EGO LIABILITY**
26              Counterdefendants.        **JURY TRIAL DEMANDED**
27

28

## COUNTERCLAIM OF PAUL EDALAT

COMES NOW, Counterclaimants Paul EDALAT and EFT GLOBAL HOLDINGS INC. dba SENTAR PHARMACEUTICALS ("EDALAT" and "Sentar" or "COUNTERCLAIMANTS") who allege damages and seeks equitable relief against ALTERNATE HEALTH USA Inc. ("AHUS"), ALTERNATE HEALTH CORP. ("AHC"), HOWARD MANN ("MANN") MICHAEL L. MURPHY, M.D. ("MURPHY"), and COMPUTERSHARE INVESTOR SERVICES, INC. ("COMPUTERSHARE") (AHUS, AHC, MANN, MURPHY and COMPUTERSHARE shall be referred to collectively as "COUNTERDEFENDANTS") alleges as follows:

## JURISDICTION AND VENUE

1.     EDALAT, and all times herein mentioned was, an individual and a resident of the County of Orange, State of California.

2.     Sentar is a California corporation with its principal place of business in Orange County, California.

3.     EDALAT and Sentar are informed and believe, and, on that basis, allege, that Counterdefendant ALTERNATE HEALTH USA Inc. ("AHUS"), is a Delaware Corporation with a principal place of business in California and a principal place of business in the State of Texas.

4.     EDALAT and Sentar are informed and believe, and, on that basis, allege, that Counterdefendant ALTERNATE HEALTH CORP. ("AHC"), is a British Columbia Corporation with a principal place of business in California and in Canada, whose shares are publicly traded on the Canadian Stock Exchange and on the OTC Markets.

5.     ALTERNATE HEALTH USA Inc. ("AHUS") and ALTERNATE HEALTH CORP. ("AHC") shall be collectively referred to as "ALTERNATE HEALTH" or simply AH.   Edalat and Sentar are informed and believes that AHUS

and AHC are alter egos of each other, present themselves as one entity or interchangeably, and do so in order to mislead outside persons and investors.  There is an identity of interest, ownership, officers, directors, operations and locations between AHUS and AHC such that both entities should be considered to be one and the same. AHUS is a wholly-owned subsidiary of AHC.

6.     EDALAT and Sentar are informed and believe, and, on that basis, allege, that Counterdefendant HOWARD MANN ("MANN") is a citizen of Canada, is domiciled in Canada, and at all times relevant was, and is, a Board member and/or officer and was the controlling person of ALTERNATE HEALTH until Murphy became the controlling person.  As such, Mann had fiduciary duties of care and loyalty to Edalat, Sentar and other shareholders of AH.

7.     Edalat and Sentar are further informed and believe that Counterdefendant MICHAEL L. MURPHY, M.D. ("MURPHY") is an individual domiciled in San Antonio, Texas and at all times relevant was, and is, a Board member and/or officer of ALTERNATE HEALTH. Edalat and Sentar further allege that AHC and Murphy are alter egos of each other, Murphy dominates and controls AHC, and AHC's financial activity consists primarily of "wash" transactions (possibly sham) among AHC and entities controlled by Murphy.  These transactions give the illusion that AHC has actual operations and revenues, when in fact the bulk of "revenues" are in the form of receivables from Murphy entities, and are balanced by payables to Murphy entities.  It is unclear if any actual monies ever change hands.  As more specifically alleged below, Murphy should be held liable for AHC's obligations as alleged herein.  In addition, after his appointment as Chairman of the Board of AH on or about April 5, 2017, Murphy held fiduciary duties of care and loyalty to Edalat, Sentar and other shareholders of AH.

8.     Edalat and Sentar are further informed and believe that Counterdefendant COMPUTERSHARE INVESTOR SERVICES, INC. ("COMPUTERSHARE") is a

Canadian corporation with its principal place of business in Canada. Edalat and Sentar are further informed and believes that, at all times relevant hereto, COMPUTERSHARE was and is the duly appointed transfer agent and registrar for the common shares of AHC.

9. Edalat and Sentar are further informed and believe that each of the COUNTERDEFENDANTS are in some manner legally responsible for the acts and omissions alleged herein, which actually and proximately caused and contributed to the various injuries and damages EDALAT has suffered, referred to herein.

10. Edalat and Sentar are further informed and believe that at all times herein mentioned, each of the COUNTERDEFENDANTS was the agent, servant, employee, alter-ego, instrumentality, representative, co-venturer, and/or partner of each of the other COUNTERDEFENDANTS, and in doing the things herein alleged, was acting within the course, scope, purpose and knowledge of such agency, employment, alter-ego, instrumentality, representation, co-venture, and/or partnership, and with the knowledge, permission and consent or with the approval or ratification of their co-COUNTERDEFENDANTS and, as such, share liability with each other with respect to said matters complained of herein.

11. At all times relevant hereto, each of the COUNTERDEFENDANTS conspired with, aided and abetted, and/or acted in concert with each and every other COUNTERDEFENDANTS to harm, injure and damage EDALAT and Sentar as hereinafter alleged and, in furtherance of the aforesaid conspiracy or other plan, each and every COUNTERDEFENDANT engaged in one or more of the overt acts hereinafter alleged.

12. This action is properly filed in the Central District of California – Southern Division, and this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. The amount in controversy, without interest and costs, exceeds $75,000.00 as specified by 28 U.S.C. § 1332. Venue is also proper under 28 U.S.C. §1391 (b)(2) as

this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

13.    The claims asserted in this Counterclaim also arise out of the same facts and circumstances as those of the First Amended Complaint, so the Court may exercise supplemental jurisdiction over them under 28 U.S.C. § 1367(a).

14.    This Court has personal jurisdiction over MURPHY, MANN, and COMPUTERSHARE as the acts they engaged in causing damage to EDALAT occurred in California and in this judicial district, and because AH has a principal office in California.  If and to the extent that MURPHY, MANN, and COMPUTERSHARE committed the wrongful acts outside of this judicial district, they committed said wrongful acts with the intent to cause a tortious effect in this judicial district and/or intentionally directed those wrongful acts at EDALAT.

## GENERAL ALLEGATIONS

15.    On or about May 19, 2016, EDALAT and MANN met.  During their initial meeting, MANN represented that he was the principal of ALTERNATE HEALTH, which he described as a recognized leader in the medicinal deployment of medical cannabis in Canada.  MANN advised EDALAT that he was intending to take ALTERNATE HEALTH public and was looking to market nutraceutical products containing cannabidiol (CBD) or tetrahydrocannbinol (THC).

16.    As of 2016, EDALAT and Sentar, as inventor and assignee, had applied for patents in different countries for an invention involving a sublingual (under the tongue) tablet delivery system (herein, the "pending patent applications" or the "Sentar Technology").

17.    Thereafter, EDALAT, MANN, and other representatives of Sentar and ALTERNATE HEALTH commenced discussions regarding ALTERNATE HEALTH's possible license of certain limited rights relating to the pending patent applications, specifically, a defined right to exploit the Sentar Technology for

sublingual delivery systems of "nutraceutical products (non-pharmaceutical)".  During the course of these discussions, ALTERNATE HEALTH also sought EDALAT's consulting services in connection with obtaining the license of the Sentar Technology and certain other areas.

18.  AH and Mann told Edalat and Sentar that AH preferred to pay for license and consulting in AHC public stock instead of cash, and also wished to pay some portion in the form of royalties instead of upfront payment.  In this regard AH and Mann were selling AH stock.  In order to induce Edalat and Sentar to accept public stock in lieu of cash, AH and Mann personally made a number of false and misleading representations concerning AH, its stock and its value, to Edalat and Sentar, including the following:

19.  On or about June 26, 2016, MANN and ALTERNATE HEALTH delivered its Business Forecast Summary dated June 26, 2016 and provided the same to Edalat and Sentar.  The Business Forecast Summary forecasted that AH would generate revenues of $200 million in its first year of operation, $500 million in its second year of operation, and $740 million in its third year of operation.  It also forecasted expected revenues from the sale of licensed products based on the Technology would generate royalties to Sentar of more than $1 million in ALTERNATE HEALTH's first year of operation, over $23 million in the second year of operation, and over $57 million in the third year of operation.  ALTERNATE HEALTH also represented through its ALTERNATE HEALTH Strategy Total Forecast that it had allocated $1.396 million for start-up expenses for sales of licensed products based upon the Technology and operating expenses of $2.2 million for marketing campaigns, operating expenses and startup costs for marketing the non-pharmaceutical products on a monthly user subscription base.

20.  However, as became clear later, unless ALTERNATE HEALTH took the initial step of commercializing licensed products based upon the Technology, it was

impossible for ALTERNATE HEALTH to meet any of the revenue or royalty forecasts from the sale of such licensed products.  Further, even if ALTERNATE HEALTH did take any of the steps required to commercialize a licensed product, ALTERNATE HEALTH's projections were false and misleading in that they were not remotely likely and had no reasonable basis in fact, as ALTERNATE HEALTH did not have the capital necessary or management capable of generating revenues in those amounts.

21.    At the time ALTERNATE HEALTH and MANN provided these financial projections to EDALAT, however, ALTERNATE HEALTH and MANN knew, or were at least reckless in not knowing, that ALTERNATE HEALTH had no intention of attempting to commercialize licensed products based on the Technology. Rather, ALTERNATE HEALTH and MANN sought to obtain the license to the Technology, and the corresponding consulting services from EDALAT, in order to use the existence of the license as a marketing tool to raise capital from unsuspecting investors.  Indeed, EDALAT and Sentar are informed and believes, and based thereon alleges, that ALTERNATE HEALTH raised approximately $9 million from investors throughout 2016 and 2017 based in large part on the promise that ALTERNATE HEALTH would commercialize and sell licensed products based on the Technology in accordance with the same projections provided to EDALAT and Sentar.

22.    To date, ALTERNATE HEALTH has not even spent a fraction of the projected millions, on commercializing the Technology, notwithstanding the large amount of capital raised based on its representations to shareholders and potential shareholders (including Edalat and Sentar) that it would use its best efforts to commercialize the Technology and allocate its capital in accordance with its projections.  Due to its failure and refusal to use its best efforts and use the proceeds from its capital raise in accordance with its representations, ALTERNATE HEALTH has never commercialized any products based on the Technology.

23.     MANN and ALTERNATE HEALTH also made materially false and misleading statements and omissions concerning ALTERNATE HEALTH's projected and actual stock value, again with no reasonable basis in fact.  In particular, on or about June 29, 2016, in a text exchange with EDALAT, MANN projected, with no reasonable basis in fact, that (a) ALTERNATE HEALTH stock should be $5 per share (as opposed to $1 per share being used to value the shares of ALTERNATE HEALTH stock being offered for EDALAT's consulting services), and (b) that ALTERNATE HEALTH could be bigger than GW Pharmaceuticals ("GW"), a publicly traded company with a stock price of $134 per share and a market capitalization of $3.7 billion:



24.     On August 15, 2016, MANN also represented to EDALAT that ALTERNATE HEALTH was at that time signing a "lab" deal with another company that would be a "1 Billion dollar contract":

THIRD AM. COUNTERCLAIM OF PAUL EDALAT ET AL. V. ALTERNATE HEALTH CORP. ET AL.
Case No. 8:17-cv-01887-CJC (JDEx)

In truth, ALTERNATE HEALTH was not about to sign a lab deal worth $1 Billion.

25.     On September 14, 2016, MANN and MURPHY falsely represented to EDALAT that they had access to 1,000 dispensaries for immediate sales of Licensed Products.  In truth, MANN and MURPHY did not have "access" to anywhere near 1,000 dispensaries.

26.     On September 30, 2016, MANN texted EDALAT and falsely represented to EDALAT that shares of ALTERNATE HEALTH had been appraised by a Wall Street investment banker at $300 per share, and that the shares to be issued to EDALAT (and Sentar) were worth "over $600M ($600 million)."  In fact, on information and belief, there was no such appraisal.

27.     MANN and ALTERNATE HEALTH knew, or were reckless in not knowing, that these representations were false and misleading when made and were made without any reasonable basis in fact.

28.     MANN and ALTERNATE HEALTH intended for EDALAT and Sentar to rely on these false and misleading representations in agreeing to accept common shares of AHC as compensation for the license and consulting services.

29.     In addition to making representations that turned out to be false when made regarding the value of the common shares of AH, Mann and AH also promised that the shares given could be sold on the public market shortly after issuance to Edalat and Sentar.  This representation also turned out to be false.

30.     In reliance these false and misleading representations regarding ALTERNATE HEALTH, its financial condition and projections, and the present value of its common shares, Edalat and Sentar agreed to license the Sentar Technology and provide consulting services, both in return for common shares.

31.     On or about January 9, 2017, AH and Sentar entered into a License Agreement.  Under the License Agreement, Sentar licensed to AH certain rights under certain listed pending patent applications relating to sublingual tablet technology.  In

return for the license, AH agreed to make an immediate, non-refundable payment of a total of 850,000 common shares of AH to Sentar.  These "License Shares" were duly authorized, validly issued, fully paid, non-assessable, and fully vested upon execution of the License Agreement.  AH agreed in writing, including as stated in its press release of March 3, 2017 and marked on the shares themselves, that the shares could be sold on the public market after four months.  AH did in fact give the shares to Sentar, but AH violated its agreement and otherwise breached its representations concerning said shares as alleged in more detail below, including the agreement to allow sale of the shares in the public market after four months.  It also turned out that AH had misrepresented the value of said shares.

32.    As further consideration for the License, AH agreed to pay a royalty "on an ongoing basis."

33.    All payments (shares and royalty) were expressly not subject to set-off or deduction for amounts allegedly owed by Sentar.

34.    On or about January 9, 2017, ALTERNATE HEALTH and EDALAT entered into an Agreement for Consulting Services (the "Consulting Agreement", a true and correct copy of which is attached to the First Amended Complaint as Exhibit A), pursuant to which ALTERNATE HEALTH retained EDALAT as an advisor and consultant to the Company for services including negotiation of the License Agreement with Sentar and introduction to certain patch technology.  The Consulting Agreement reflected in large part consulting services already rendered to ALTERNATE HEALTH between May 2016 and January 9, 2017.

35.    Pursuant to the Consulting Agreement, as compensation for EDALAT's entering into the Consulting Agreement, ALTERATE HEALTH issued to EDALAT a total of 2,118,506 shares of ALTERNATE HEALTH common stock (the "Consulting Shares").  The Consulting Shares were duly authorized, validly issued, fully paid, non-assessable, and fully vested upon execution of the Consulting Agreement.  The

Consulting Shares were the only consideration that EDALAT received for his retention as a consultant and advisor and for the consulting and advisory services he provided to ALTERNATE HEALTH.

36.    Concurrently with the execution of the Consulting Agreement, and pursuant to his rights thereunder, Edalat requested AH to issue some of the shares to other individuals.  This was fully agreed and acknowledged by AH.  Indeed, in its "Form 9" filing with the regulatory authorities, AH listed the individual assignees/share recipients and the number of shares issued to each.  Among other recipients, Amir Asvadi, a person affiliated with Sentar, received 300,000 shares.

37.    The License Shares and the Consulting Shares were issued as "restricted securities" (as that term is defined in the Securities Act of 1933, as amended (the "1933 Act")) in reliance on a private placement exemption from the registration requirements of the 1933 Act, but expressly could be sold after four months.  The certificates representing the License Shares and the Consulting Shares bore only the following two legends (the "Restrictive Legends"):

> UNLESS PERMITTED UNDER SECURITIES
> LEGISLATION, THE HOLDER OF THIS SECURITY MUST
> NOT TRADE THE SECURITY BEFORE JULY 03, 2017,
> WITHOUT PRIOR WRITTEN APPROVAL OF THE
> CANADIAN SECURITIES EXCHANGE AND
> COMPLIANCE WITH ALL APPLICABLE SECURITIES
> LEGISLATION, THE SECURITIES REPRESENTED
> BY THIS CERTIFICATE MAY NOT BE SOLD,
> TRANSFERRED, HYPOTHECATED OR OTHERWISE
> TRADED ON OR THORUGH THE FACILITIES OF THE
> CANADIAN SECURITIES EXCHANGE OR OTHERWISE

IN CANADA OR TO OR FOR THE BENEFIT OF A CANADIAN RESIDENT <u>UNTIL JULY 03, 2017</u>.

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT").  THESE SECURITIES MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (A) TO THE COMPANY; (B) OUTSIDE THE UNITED STATES IN COMPLIANCE WITH RULE 904 OF REGULATION S UNDER THE U.S. SECURITIES ACT OR (C) IN COMPLIANCE WITH THE EXEMPTION FROM REGISTRATION REQUIREMENTS UNDER THE U.S. SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER, IF AVAILABLE, AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS; OR (D) IN A TRANSACTION THAT DOES NOT REQUIRE REGISTRATION UNDER THE U.S. SECURITIES ACT OR ANY APPLICABLE STATE LAWS, AND, THE HOLDER HAS, PRIOR TO SUCH SALE, FURNISHED TO THE COMPANY AN OPINION OF COUNSEL OR OTHER EVIDENCE OF EXEMPTION, IN EITHER CASE REASONABLY SATISFACTORY TO THE COMPANY. DELIVERY OF THIS CERTIFICATE MAY NOT CONSTITUTE "GOOD DELIVERY" IN SETTLEMENT OF TRANSACTIONS ON STOCK EXCHANGES IN CANADA.

38.     On or about March 3, 2017, AH issued a press release confirming the issuance of the License Shares and Consulting Shares and that the shares were subject to a "four month hold."  This is more or less consistent with the agreement to allow sale after July 3, 2017, or four months after share issuance on or about March 3, 2017.

39.     Edalat and Sentar entered into the Consulting and License agreements with the intention of selling the AH shares for cash when allowed, or after the four month holding period.  Indeed, the promised and contracted ability and right to sell the shares on the market, was of the essence of the contract and the reason Edalat and Sentar agreed to accept shares instead of cash.

40.     On or about March 8, 2017, AH acquired a 20% interest in a company called Clover Trail Capital LLC, in return for issuance of 4,557,150 common shares of AH "subject to a four month hold"  -- the same terms as the shares issued to Edalat, Sentar and the others.  Defendant Michael Murphy "indirectly controlled" Clover Trail and thus became an actual or beneficial owner of AH shares as of March 8, 2017.  Thereafter, Murphy had a personal interest in preventing Edalat, Sentar and the assignees from being able to sell AH shares, in order to increase the value of his own shares.   After the Clover Trail transaction, Murphy received more shares of AH.  With each additional share issued to Murphy or to entities controlled by Murphy, Murphy had a larger personal incentive and motive to prevent Edalat, Sentar and the assignees from selling their AH shares.

41.     Commencing in or about April 2017, unbeknownst to Edalat and Sentar, and never disclosed to other shareholders, Mann began selling shares of AH.  Specifically, Mann caused a large number of shares lodged in the name of his mother, Mary J. Mann, to be sold.  Mann sold the shares without any disclosure of insider selling.  On information and belief, these sales continued through and past July 2017.

42.     On information and belief, Mann was able to sell and did sell in excess of 100,000 shares, all at market price, or approximately $3 per share.

43.     Mann's own sale of shares provided him with a personal incentive to prevent Edalat and Sentar from being able to sell shares.  The fewer shares available for sale on the market, Mann understood, the easier and faster Mann could sell his own shares.

44.     At approximately the same time, Murphy also had a personal interest and incentive in maximizing the value of the shares.  On information and belief, at the relevant time Murphy was planning to have AH issue shares to Murphy in return for a promissory note given to Murphy in return for an interest in a Murphy-owned or controlled entity.  Murphy in fact had AH issue approximately 1 million shares to Murphy "in lieu of" the promissory note.  Murphy believed that allowing Edalat and Sentar to sell their shares at approximately the same time, would reduce the value of shares to be issued or that had been issued to Murphy.

45.     In order to sell the shares on July 3, 2017 as agreed, AH and COMPUTERSHARE had to remove the legend on the stock certificates.  To this end, on or after July 3, 2017, Canaccord Genuity Wealth Management (USA) Inc. ("Cannacord"), acting as broker for EDALAT and other assignees, delivered to ALTERNATE HEALTH and COMPUTERSHARE all documentation from the shareholder necessary to allow ALTERNATE HEALTH and COMPUTERSHARE to remove the Restrictive Legends from the certificates representing the License Shares and Consulting Shares to allow Edalat, Sentar and other assignees to sell the shares.

46.     At the relevant time the AH share price was approximately US $2 per share.  Thus if AH and COMPUTERSHARE had removed the legend and allowed sale of the shares, as agreed, Edalat, Sentar and the other assignees would have received approximately US $6 million from sale of the shares.

47.     On or about September 18, 2017, COMPUTERSHARE notified Cannacord that COMPUTERSHARE and ALTERNATE HEALTH would not remove the Restrictive Legends from the certificate representing the shares issued to Edalat,

-15-

Sentar and certain other assignees, so that the shares could not be sold. ALTERNATE HEALTH and COMPUTERSHARE continue to refuse to remove the Restrictive Legends from the certificate representing said shares and issue a certificate without a restrictive legend, even though said shares are duly authorized, validly issued, fully paid, non-assessable, and fully vested, and non-refundable, and all the conditions for the removal have been met.

48.     EDALAT and Sentar are informed and believes, and based thereon alleges, that ALTERNATE HEALTH has refused to register the transfer of the shares in an unlawful attempt to manipulate its own stock price by artificially restricting the supply of its common shares into the market to artificially prop up its stock price. Edalat and Sentar are further informed and believe that Mann and Murphy personally caused AH to prevent the share transfer in order to advance their own personal interests (value and/or sale of their own shares) at the expense of their shareholders Edalat, Sentar and the other assignees.

49.     In other words, on information and belief, the denial of share registration was orchestrated by AH, Mann, and Murphy, each of whom had a personal incentive to prevent Edalat, Sentar and the others from selling AH shares.

50.     As a result of COMPUTERSHARE's and ALTERNATE HEALTH's refusal to remove the Restrictive Legends, ALTERNATE HEALTH and COMPUTERSHARE have wrongfully eliminated EDALAT's ability to sell, transfer, hypothecate, or otherwise dispose of the Consulting Shares (which were worth up to $7,500,000), thus artificially propping up the stock price of AHC while causing significant damages to EDALAT.  Further, EDALAT (and his designees) still cannot sell the Consulting Shares, notwithstanding their right to do so.  As a result, EDALAT (and his designees) have has suffered losses of up to $6 million.  The specific loss is the number of shares times the share price when sale was to be permitted.

51.     Further, if the Shares had been as represented by MANN, MURPHY, and ALTERNATE HEALTH, the Consulting Shares would have had a value of up to $200,000,000 or $300 per share as stated by Mann.

52.     <u>Alter Ego allegations</u>:  Murphy is the alter ego of AH and is liable for AH's obligations in tort and contract, for reasons including the following:

53.     Murphy dominates and controls AH, through his position at AH (chairman or CEO or both), his substantial share ownership, that AH has acquired entities controlled by Mann, and that virtually all of AH's operations consist of transactions (probably sham) with Murphy entities.  Put another way, what presents itself as Alternate Health, is in fact a group of interlocking entities controlled by Murphy.

54.     On or about January 1, 2017, AH purchased 100% of Alternate Health Labs, Inc. ("AHL") from Murphy in return for 2,270,355 shares of AH.  On information and belief, this and the Clover Trail transaction (see below) made Murphy the single largest shareholder and controlling shareholder of AH.

55.     AH utilized the AHL purchase in order to inflate its earnings.  Among other actions, AH arbitrarily valued the "customer relationships" of AHL at $1,626,834.  These "customer relationships" were written off to zero as of July 1, 2017, i.e., had no value.  However, AH used the inflated figure for customer relationships to inflate the claimed value of AHL above the purchase price.  As a result, AH claimed a "bargain purchase" of AHL of some $2 million.  On information and belief, AH reported this $2 million as income for the year ended March 2017, which was half of AH's reported income for the year ending March 2017.  In other words, half of AH's reported income in 2017 consisted of ephemeral paper profits from a Murphy transaction.

56.     After his appointment as chairman and/or CEO of AH, Murphy caused AH to purchase complete or controlling interests in entities controlled by Murphy.  On

or about January 13, 2017, AH purchased a 20% interest in Murphy's entity Clover Trail Capital LLC in return for issuance of over 5,300,000 shares of Murphy including a promissory note later converted to shares.  Clover Trail, in turn, owned 40% of Sun Clinical Laboratories LLC.  The investment in Clover Trial was written down to zero within 12 months, meaning, Murphy acquired the shares in AH in return for nothing. In both the AHL and Clover Trail transactions, on information and belief, Murphy and AH overvalued the purchased asset in order to show either income or an inflated balance sheet for a quarter or two until AH was obligated to write down all or some of the asset value.  But in both cases, Murphy kept all the issued shares.

57.     Murphy is the controlling shareholder of Sun Clinical and of LMK Management LLC.  LMK management allegedly manages Sun Clinical in return for a fee.

58.     For the calendar year ended March 18, 2017, AH reported some $2.7 million in accounts receivable and $2,548,176 in accounts payable.  However, according to the notes to financial statements, some $1 million of the accounts receivable are monies alleged owed by Sun Clinical, a Murphy entity.  But $2 million of the accounts payable are owed to LMK, another Murphy entity.  In other words, the greater part of the economic activity of AH consists of receivables from and payables to Murphy entities.  On information and belief, corresponding to the receivables and payables, much of the revenue to AH also comes from Murphy's entity Sun Clinical, and much of AH's expenses are paid to Murphy's entity LMK.

59.     Put another away, AH is simply a "cover" or "conduit" for transactions among Murphy's entities.  These transactions help maintain the illusion that AH has actual operations and revenue, when in fact the operations and revenue simply consist of "wash" transactions between Murphy entities (e.g. revenues from Sun Clinical balanced or exceeded by payments to LMK).

60.     Murphy, in turn, uses the illusion of operations in order to cause AH to raise more money from investors and/or lenders.  In turn, on information and belief, Murphy causes AH to pay Murphy personally a large salary and still more shares of AH.  On information and belief, Murphy has essentially drained AH of cash primarily to pay salaries and other payments to himself and his associates.  This activity has also rendered AH unable to pay Edalat or Sentar their damages in this action.

61.     It would perpetrate an injustice to maintain the fiction of independence between AH and Murphy.  Instead, Murphy should be found to be the alter ego of AH and Murphy held liable for AH's obligations in general and to Edalat and Sentar herein.

## FIRST CAUSE OF ACTION

### Fraud

### (Against Counterdefendants ALTERNATE HEALTH, MANN, and MURPHY)

62.     EDALAT and Sentar refer to and incorporates herein by reference each and every other paragraph of this counterclaim as though fully set forth herein.

63.     As more specifically alleged above, Counterdefendants AHC, AHUS and Mann made false and misleading representations to EDALAT and Sentar without any reasonable basis in fact.  These representations were false, and AHC, AHUS and Mann knew, or were reckless in not knowing, that these representations were false and misleading when made and were made without any reasonable basis in fact.

64.     AHC, AHUS and Mann intended for Sentar and Edalat to rely on these false and misleading representations in granting the license agreement and agreeing to provide consulting and providing consulting as compensation.

65.     EDALAT and Sentar reasonably relied on these false and misleading representations regarding AH, its financial condition and projections, and its common shares, and accordingly, EDALAT and Sentar entered into the agreements

and Edalat continued to provide consulting services to the extent requested by AH.

66.     Edalat and Sentar were damaged in that the shares issued were never worth what AH and Mann claimed.  Specifically, instead of $300 per share, the shares were worth at most the market price of some $4 per share (at time of issuance after public listing), or zero in that AH and Mann made sure the shares could never be sold.

67.     Edalat and Sentar are entitled to the difference between the promised value of the shares, and the actual value, according to proof, against AH and Mann.

68.     AH and Mann's acts, practices, and courses of conduct were performed intentionally, knowingly, deceitfully, and fraudulently, with reckless indifference toward, and a disregard of, the rights of EDALAT and Sentar, with the intention on their part of depriving EDALAT and Sentar of property and legal rights and otherwise causing injury.  Such misconduct was and is despicable and fraudulent conduct that has subjected EDALAT and Sentar to unjust hardship, entitling EDALAT to exemplary and punitive damages in an amount to be determined at trial.

69.     Murphy is liable to the same extent as AHC and AHUS on the basis of alter ego liability.

## SECOND CAUSE OF ACTION

### Negligent Misrepresentation

### (Against Counterdefendants ALTERNATE HEALTH, MANN, and MURPHY)

70.     EDALAT and Sentar refer to and incorporates herein by reference each and every other paragraph of this complaint as though fully set forth herein.

71.      As more specifically alleged above, Counterdefendants AH and Mann made false and misleading representations to EDALAT and Sentar without any reasonable basis in fact.  These representations were false, and AH and Mann had no reasonable grounds for believing the representations were true when made.

72.     AH and Mann intended for EDALAT and Sentar to rely on these false and misleading representations in entering into the Consulting and License agreements and providing the license and consulting services in return for common shares of AHC.

73.     EDALAT and Sentar reasonably relied on these false and misleading representations regarding AH, its financial condition and projections, and its common shares, and accordingly, EDALAT and Sentar entered into the agreements and Edalat continued to provide consulting services to the extent requested by AH.

74.     Edalat and Sentar were damaged in that the shares issued were never worth what AH and Mann claimed.  Specifically, instead of $300 per share, the shares were worth at most the market price of some $4 per share (after public listing), or zero in that AH and Mann made sure the shares could never be sold.

75.     Edalat and Sentar are entitled to a judgment against AHC, AHUS, Mann and Murphy equal to the difference between the promised value of the shares, and the actual value, according to proof.  Murphy is liable to the same extent as AHC and AHUS on the basis of alter ego liability.

## **THIRD CAUSE OF ACTION**

### **Breach of Contract**

### **(Against Counterdefendants AHUS and AHC and Murphy)**

76.     Edalat and Sentar refer to and incorporate herein by reference each and every other paragraph of this complaint as though fully set forth herein.

77.     On or about January 9, 2017, AHUS/AHC ("AH") entered into the License Agreement and Consulting Agreement with Sentar and Edalat, respectively. The shares as issued (as agreed) contained an express provision that any restriction on sale would be removed within four months of issuance or not later than July 3, 2017. This was confirmed in AH's securities filing that described the share issuance.

78.     In addition to the express terms of the contracts, implied by law in every

contract is the covenant of good faith and fair dealing, which functions as a supplement to the express contractual provisions to prevent a contracting party from engaging in conduct which, while not technically transgressing the express covenants, frustrates the other party's rights to the benefits of the contract.  The covenant also requires each party to do everything the contract presupposes the party will do to accomplish the contract's purposes.

79.     EDALAT and Sentar had an express right under the contracts to receive the sahres, but the benefits from the shares would come from the ability to resell the shares after four months as expressly stated on the shares.  Refusing to remove the Restrictive Legends from the certificate representing shares and issue a certificate without a restrictive legend, when the shares are duly authorized, validly issued, fully paid, non-assessable, and fully vested, and when all the conditions for the removal have been met, frustrates Edalat and Sentar's right to the benefit of the shares and constitutes a breach of the implied covenant of good faith and fair dealing, and thus, a breach of the License and Consulting agreements.

80.     Edalat and Sentar performed all performances on their part to be performed under the License and Consulting Agreements.

81.     AH breached the contract and/or the covenant of good faith and fair dealing by refusing to remove the restriction such that Edalat and Sentar were rendered unable to sell the shares.

82.     As a direct and proximate result of the breach(es), Edalat and Sentar were deprived of the market price of the shares as of the date of sale times the number of shares, or $6 million or according to proof. Edalat and Sentar are entitled to judgment in that sum against AH and Murphy (the latter on the basis of alter ego liability).

## FOURTH CAUSE OF ACTION

### Refusal to Register Transfer of Securities

### (Against Counterdefendants AHC and COMPUTERSHARE and Murphy)

83.     Edalat and Sentar refer to and incorporate herein by reference each and every other paragraph of this complaint as though fully set forth herein.

84.     COUNTERDEFENDANT AHC is under a duty to register the transfer of its securities if the statutory conditions of Section 86 of the Securities Transfer Act of British Columbia are met.

85.     In relevant part, Section 86 provides that the issuer (AHC) must register the transfer (in this case, register the transfer to a brokerage for resale on the open market) if required "under the terms of the security."  In this case, the security stated, on the legend, that it could be sold after July 3, 2017, therefore, AHC had to facilitate sale of the security after July 3, 2017.  The other requirements of Section 86 are administrative and were met.

86.     COUNTERDEFENDANT COMPUTERSHARE is the transfer agent for AHC in the registration of transfers of AHC's common shares and has the same duty to register the transfer of AHC's securities if the statutory conditions of Section 86 of the Securities Transfer Act of British Columbia are met.  Specifically, under Section 94 of the Securities Transfer Act (and US Uniform Commercial Code § 8-407), Computershare has exactly the same obligation as the issuer to transfer the shares.  A transfer agent who delays or refuses the request is liable to the shareholder for a wrongful refusal to transfer.  In particular, it is no defense for Computershare that AHC refused to cooperate in the transfer.

87.     EDALAT and Sentar met the statutory conditions of Section 86 of the Securities Transfer Act of British Columbia for the transfer of their shares, but COUNTERDEFENDANTS AHC and COMPUTERSHARE have failed, and have continued to fail, to register the transfer of the shares by refusing to remove the

Restrictive Legends from the certificate representing EDALAT's Consulting Shares and issue a certificate without a restrictive legend, when the Consulting Shares are duly authorized, validly issued, fully paid, non-assessable, and fully vested, and when all the conditions for the removal have been met, and the securities themselves state they can be sold after July 3, 2017.

88.     Pursuant to Sections 86 and 94 of the Securities Transfer Act of British Columbia, COUNTERDEFENDANTS AHC and COMPUTERSHARE are jointly and severally liable to Edalat and Sentar for loss resulting from unreasonable delay in registration or failure or refusal to register the transfer.

89.     Edalat and Sentar are entitled to judgment against Computershare and AHC and Murphy (on the basis of alter ego liability) in the amount of the value of the shares at the time transfer and sale were to be permitted or $6 million or according to proof.

90.     Alternatively or in addition, Edalat and Sentar are entitled to an order directed to Computershare and AHC to cause transfer of the shares and removal of the restrictive legend.  The judgment should also include an order that COUNTERDEFENDANTS shall take no action to suspend or otherwise thwart Edalat (or his designees) or Sentar from selling, transferring, hypothecating, or otherwise disposing of the Consulting Shares in the future.

### FIFTH CAUSE OF ACTION

### Declaratory and Equitable Relief

### (Against Counterdefendants AHUS, AHC and Computershare)

91.     Edalat and Sentar refer to and incorporate herein by reference each and every other paragraph of this complaint as though fully set forth herein.

92.     COUNTERDEFENDANTS AHC and COMPUTERSHARE have failed, and have continued to fail, to register the transfer of the shares by refusing to remove the Restrictive Legends from the certificates and issue certificates without a

restrictive legend, when the shares are duly authorized, validly issued, fully paid, non-assessable, and fully vested, and when all the conditions for the removal have been met, and the shares themselves state they may be sold after July 3, 2017.

93.     An actual and justiciable controversy now exists between Edalat and Sentar, on the one hand, and AH and Computershare, on the other, in that the former contend they are entitled to removal of the legend and ability to sell their shares, while the former contend otherwise.

94.     Edalat and Sentar are entitled to a declaration and order that the legend shall be removed from the shares and the shares placed for sale on the open market.

95.     The judgment should also include an order that COUNTERDEFENDANTS shall take no action to suspend or otherwise thwart Edalat (or his designees) or Sentar from selling, transferring, hypothecating, or otherwise disposing of the Consulting Shares in the future.

### SIXTH CAUSE OF ACTION

**Breach of Fiduciary Duty**

**(Against Counterdefendants Mann and Murphy)**

96.     Edalat and Sentar refer to and incorporate herein by reference each and every other paragraph of this complaint as though fully set forth herein.

97.     At all relevant times, Mann was a director and/or officer of AH and thus had fiduciary duties to Edalat and Sentar in their capacity as shareholders of AH.

98.     Mann breached his fiduciary duty of loyalty to Edalat and Sentar by secretly selling shares of AH through Mann's mother while, at the same time, preventing or contributing to preventing Edalat and Sentar from selling their shares.

99.     Specifically, Mann knew that he could realize more money, or sell his shares faster, if he could prevent Edalat and Sentar from selling shares.  Mann thus used his position as director or officer of AH to block Edalat and Sentar from selling shares.

100.   At approximately the same time Murphy also had an incentive do, and did, prevent the sale of Edalat and Sentar's shares in order to increase or maintain the value of Murphy's shares previously issued or to be issued in lieu of the promissory note.

101.   Mann's and Murphy's actions favored their own interests over those of his shareholders and thus violated their fiduciary duty of loyalty to shareholders.

102.   Mann's and Murphy's actions damaged Edalat and Sentar in that they were prevented from selling their shares on the market, for damages of $6 million or according to proof.

## SEVENTH CAUSE OF ACTION

### Alter Ego Declaration

### (Against Counterdefendants Mann and Murphy)

103.   Edalat and Sentar refer to and incorporate herein by reference each and every other paragraph of this complaint as though fully set forth herein

104.   There is an identity of interest between Murphy and AH, through Murphy's entities such as Sun Clinical and LMK.  AH consists almost entirely of Murphy entities, and AH's reported financial operations consist mostly of "wash" transactions between AH and Murphy entities.  Murphy dominates and controls both AH and AH's subsidiary entities and operations.

105.   Murphy is using the purported separate existence of AH to perpetrate a fraud, namely, to maintain the illusion of an operating public company when in fact AH has little or no operations, and the reported operations are simply transactions back and forth with Murphy entities.  To the extent there are actual monies going to and from AH, these go to and from Murphy entities such as Sun Clinical and LMK.

106.   Counterclaimants are entitled to a finding that Murphy is the alter ego of AH and Murphy is personally liable for AH's obligations as found in this case.

**WHEREFORE,** Counterclaimants EDALAT and Sentar pray for judgment as

follows:

1.     Damages against all defendants for the value of the shares granted in the License and Consulting agreements as of July 3, 2017, or according to proof.

2.     Damages against defendants AHC, AHUS and Mann and Murphy for the difference between the value of the shares as represented by AHC, AHUS and Mann, and the actual value of the shares when issued.

3.     A preliminary and permanent order directing defendants AHC, AHUS and Murphy as alter ego, and Computershare, to immediately remove the legend on the shares and allow immediate sale of the shares on the open market, including an order that said defendants cooperate and do all things necessary for sale of the shares.

4.     A declaration of effect that defendants AHC, AHUS and Murphy as alter ego, and Computershare, are obligated to immediately remove the legend on the shares and allow immediate sale of the shares on the open market, including an order that said defendants cooperate and do all things necessary for sale of the shares.

5.     For punitive damages against AHC, AHUS, Mann and Murphy (the latter on the basis of alter ego liability);

6.     For an award of interest, including pre-judgment interest, at the legal rate;

7.     For an award of attorney's fees to the extent available under the contracts;

8.     For costs of suit incurred herein; and

9.     For such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

Counterclaimants hereby demand trial of this action by jury.

DATED:     December 5, 2018     By:     */ s / Saied Kashani*
                                             Saied Kashani, Attorney for
                                             PAUL EDALAT and EFT Global
                                             Holdings Inc. ("Sentar")

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a true and correct copy of the above amended counterclaim was served on counsel of record in accordance with the Federal Rule of Civil Procedure on December 13, 2018, via this Court's ECF System:

John Markham
Markham & Read
One Commercial Wharf West
Boston, MA  02110
JMarkham@markhamread.com

*Attorneys for Plaintiffs and Crossdefendants Alternate Health USA Inc. and Alternate Health Corp. and crossdefendants Howard Mann and Michael Murphy*

*(Served via this Court's ECF System Only)*

I am readily familiar with Indeglia & Carney LLP's practice for collecting and processing correspondence for mailing with the United States Postal Service and Overnight Delivery Service. That practice includes the deposit of all correspondence with the United States Postal Service and/or Overnight Delivery Service the same day it is collected and processed.

I declare under perjury under the laws of the State of California that the forgoing is true and correct.

Executed on December 13, 2018 at Los Angeles, California.


*/s/ Saied Kashani*

THIRD AM. COUNTERCLAIM OF PAUL EDALAT ET AL. V. ALTERNATE HEALTH CORP. ET AL.
Case No. 8:17-cv-01887-CJC (JDEx)