1
2
3
4
5
6
7

8                    **UNITED STATES DISTRICT COURT**

9              **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10

11   ALTERNATE HEALTH USA INC.;          Case No. 8:17-cv-01887-JWH-JDEx
     ALTERNATE HEALTH CORP.; and
12   ALTERNATE HEALTH, INC.,
                                          **ORDER ON MOTION FOR**
13              Plaintiffs,               **SUMMARY JUDGMENT OR**
                                          **PARTIAL SUMMARY JUDGMENT**
14        v.                              **OF DEFENDANTS PAUL**
                                          **EDALAT, FARAH BARGHI,**
15   PAUL EDALAT;                         **OLIVIA KARPINSKI, EFT**
     OLIVIA KARPINSKI;                    **GLOBAL DBA SENTAR**
16   FARAH BARGHI;                        **PHARMACEUTICALS, AND APS**
     EFT GLOBAL HOLDINGS, INC.            **HEALTH SCIENCES [ECF No. 116]**
17      D/B/A SENTAR
        PHARMACEUTICALS; and
18   APS HEALTH SCIENCES, INC.,

19              Defendants.

20   PAUL EDALAT;
     EFT GLOBAL HOLDINGS, INC. dba
21      SENTAR PHARMACEUTICALS;
     FARAH BARGHI; and OLIVIA
22      KARPINSKI, on behalf of
        themselves and derivatively on
23      behalf of ALTERNATE HEALTH
        USA INC. and ALTERNATE
24      HEALTH CORP.,

25              Counterclaimants,

26        v.

27   ALTERNATE HEALTH USA INC.,
     ALTERNATE HEALTH CORP.,
28   ALTERNATE HEALTH, INC.,

1  HOWARD MANN,
2  MICHAEL L. MURPHY, M.D., and
   COMPUTERSHARE INVESTOR
   SERVICES, INC.,
3
            Counterdefendants.
4

## I.  <u>INTRODUCTION</u>

Before the Court is the motion for summary judgment or partial summary judgment of Defendants Paul Edalat; Farah Barghi; Olivia Karpinski; EFT Global Holdings, Inc. dba Sentar Pharmaceuticals ("<u>Sentar</u>"); and APS Health Sciences, Inc.[1]  For the reasons explained below, the Court **DENIES** the Motion.

## II.  <u>PROCEDURAL BACKGROUND</u>

On October 26, 2017, Plaintiffs Alternate Health USA Inc. and Alternate Health Corp. filed their Complaint against Paul Edalat, commencing this action.[2]  On December 13, 2017, Alternate Health USA Inc. and Alternate Health Corp. filed their First Amended Complaint.[3]  On December 6, 2018, the parties filed a Stipulation to File Amended Pleadings.[4]  The next day, the Court issued an order[5] granting the stipulation, which, *inter alia*, permitted Alternate Health USA Inc. and Alternate Health Corp. to file a Second Amended Complaint.[6]  On December 11, 2018, Alternate Health USA Inc.; Alternate Health Corp.; and Alternate Health, Inc. (collectively, "<u>Alternate Health</u>") filed the SAC, which is the operative complaint.[7]  In the SAC, Alternate Health asserts the following claims for relief:  (1) Fraud in the Inducement (against Defendants Edalat and Sentar); (2) Fraud and Deceit (against all Defendants); and (3) Fraud by Concealment (against all Defendants).[8]

---

[1]    Motion for Summary Judgment or Partial Summary Judgment Against Plaintiffs' Operative Complaint (the "<u>Motion</u>") [ECF No. 116].

[2]    Compl. [ECF No. 1].

[3]    First Am. Compl. [ECF No. 21].

[4]    Stip. to File Am. Pleadings [ECF No. 70].

[5]    Order Granting Stip. to File Am. Pleadings [ECF No. 71].

[6]    Second Am. Compl. (the "<u>SAC</u>") [ECF No. 72].

[7]    *Id.*

[8]    *Id.*

On January 30, 2021, Defendants filed the instant Motion and supporting papers.[9]  On January 31, 2021, Defendants filed their proposed judgment[10] in support of their motion for summary judgment and their proposed order[11] in support of their motion in the alternative for partial summary judgment.  On February 12, 2021, Alternate Health filed its Opposition to the Motion[12] and supporting papers.[13]  On February 24, 2021, Defendants filed their Reply.[14]  On March 19, 2021, the Court heard oral argument on the Motion.

### III.  FACTUAL BACKGROUND

**A.   Undisputed Facts**

Unless otherwise stated, the following facts are undisputed:

Edalat (or his related entities) and Alternate Health entered into four written agreements, each involving the business of cannabis-derived nutraceuticals:  (1) a consulting agreement between Alternate Health and Paul Edalat (the "Consulting Agreement"); (2) a license agreement for sublingual

---

[9]    Specifically, in addition to the Motion, Defendants filed:  (1) Separate Statement of Uncontroverted Facts (the "SUF") [ECF No. 116-1]; (2) Decl. of Paul Edalat [ECF No. 116-2]; and (3) Decl. of Saied Kashani [ECF No. 116-3].

[10]    Proposed Judgment on Motion [ECF No. 117].

[11]    Proposed Order on Motion [ECF No. 117-1].  The proposed order requests that the Court find that all claims arising out of each of the respective agreements at issue in this case "lack merit and may not be pursued."  *See id.*

[12]    Opp'n to the Motion (the "Opposition") [ECF No. 121].

[13]    Specifically, in addition to the Opposition, Plaintiffs filed:  (1) Decl. of Howard Mann (the "Mann Declaration") [ECF No. 121-1]; (2) Decl. of Howard Mann Authenticating Exhibits [ECF No. 121-14]; (3) Decl. of Bridget Zerner [ECF No. 121-15]; (4) Objections to Evidence [ECF No. 121-16]; (5) Statement of Genuine Disputes (the "SGD") [ECF No. 121-17]; and (6) Proposed Order [ECF No. 121-8].

[14]    Reply in Supp. of the Motion (the "Reply") [ECF No. 126].  On February 19, 2021, Defendants filed a reply brief [ECF No. 122].  Three days later, Alternate Health filed a motion to strike that brief [ECF No. 123] because it did not comply with the page-length restriction in the Court's Standing Order.  On February 23, 2021, the Court granted the motion to strike, in part, and directed Defendants to file a reply in conformance with the Local Rules and the Court's Standing Order [ECF No. 125].  The next day, Defendants filed the Reply.

delivery systems between Alternate Health and licensor Sentar (the "<u>License Agreement</u>"); (3) a manufacturing agreement between Alternate Health and Sentar (the "<u>Manufacturing Agreement</u>"); and (4) a license agreement between Alternate Health and APS Health Sciences regarding certain formulations of nutraceuticals for pets (the "<u>APS Agreement</u>").[15]  The Alternate Health parties were sophisticated entities "with particular knowledge of the trade terms being used in the subject agreements."[16]

### 1. **The Consulting Agreement**

Under the Consulting Agreement, Edalat agreed to provide consulting services to Alternate Health in exchange for shares of Alternate Health stock.[17] This agreement contains an integration clause that states, "The Agreement is intended to be the final, complete and exclusive statement of the terms of the parties' agreements regarding these subjects and supersedes all other prior and contemporaneous agreements and statements on these subjects."[18]

### 2. **The License Agreement for Sublingual Delivery Systems**

With respect to the License Agreement, Alternate Health acquired certain "Licensor Patent Rights" that are expressly listed in Exhibit A to the agreement.[19]  Although Exhibit A lists patent "applications," Alternate Health disputes that it was aware that the agreement referred only to applications and maintains that it "understood that actual patents were included not just applications."[20]

---

[15]   SUF at ¶¶ 6 & 7.
[16]   *Id.* at ¶ 1.
[17]   *Id.* at ¶ 8.
[18]   *Id.* at ¶ 11.
[19]   *Id.* at ¶ 14.
[20]   *Id.* at ¶ 15; SGD at ¶ 15.

Alternate Health does not contend that any of the listed patent applications were not pending as of the time of the license.[21] Nor does Alternate Health dispute that an Australian patent had issued at the time that the parties entered into the License Agreement.[22] Subsequently, a Canadian patent also issued.[23]

The License Agreement includes disclaimers of warranty regarding the merchantability or fitness for any purpose of the licensed technology.[24] The License Agreement also provides that "[n]othing in this agreement will be construed as: . . . [a] warranty or representation by Licensor as to the validity or scope or any Licensor Patent Rights."[25] The License Agreement contains an express integration clause and waiver of prior representations that states the following: "This Agreement and Exhibits embody the entire understanding of the Parties and supersedes all previous communications, representations or understandings, either oral or written, between the Parties relating to the subject matter hereof."[26]

Alternate Health used the License Agreement in part to raise funds from investors, and it has not offered to return those funds.[27] Alternate Health contends that the licensed sublingual technology "does not work," but Alternate Health has not designated an expert witness with respect to the licensed technology, and the time to do so has passed.[28] Alternate Health

---

[21]   SUF at ¶ 17.
[22]   *Id.* at ¶ 19.
[23]   *Id.* at ¶ 20.
[24]   *Id.* at ¶ 21.
[25]   *Id.* at ¶ 22.
[26]   *Id.* at ¶ 28.
[27]   *Id.* at ¶¶ 34-37.
[28]   *Id.* at ¶ 40.

contends, however, that the licensed sublingual technology "does not work" because the United States Patent and Trademark Office rejected the patent.[29]

### 3. The Manufacturing Agreement

On January 16, 2017, Alternate Health and Sentar entered into the Manufacturing Agreement, under which Alternate Health "agree[d] to supply approximately 1 kilo of Raw Material to manufactured [*sic*] into sublingual tablets" in exchange for $100,000 to be paid two days after Alternate Health began trading on the Canadian Securities Exchange and $50,000 to be paid upon delivery of the tablets.[30]  The parties dispute whether Sentar delivered 10,000 tablets (as Alternate Health maintains) or roughly 50,000 tablets (as Sentar maintains).[31]  On February 28, 2017, Alternate Health paid the balance of the purchase price per the invoice that Sentar transmitted to Alternate Health upon delivery of the tablets.[32]

### 4. The APS Agreement

On May 1, 2017, Alternate Health and APS Health Sciences Inc. entered into the APS Agreement.[33]  This agreement licensed formulations for certain CBD (a non-psychoactive compound derived from cannabis) formulations for pets.[34]  The APS Agreement contains the following express disclaimer of warranty of merchantability or fitness for use of any kind:  "This License, Licensed Product(s) and Licensor Copyright Rights are provided WITHOUT WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTY, EXPRESS OR

---

[29]     SGD at ¶ 41.
[30]     SUF at ¶ 44.
[31]     *Id.* at ¶¶ 46-48.
[32]     *Id.* at ¶ 49.
[33]     *Id.* at ¶ 52.
[34]     *Id.* at ¶¶ 53 & 54.

IMPLIED."[35]  The APS Agreement also has an express integration clause and a waiver of prior representations, which provides as follows:  "This Agreement and Exhibits embody the entire understanding of the Parties and supersedes all previous communications, representations or understandings, either oral or written, between the Parties relating to the subject matter hereof."[36]

### 5.   The Cahill Complaint

On April 12, 2016, non-party Bruce Cahill filed a lawsuit in this District against the same defendants as those in this case.[37]  The allegations of fraud in that lawsuit are similar to the allegations in the instant case.[38]  Not later than June 11, 2016, Edalat provided Cahill's complaint to Counterdefendant Howard Mann, the "point man" for Alternate Health.[39]  Not later than September 3, 2016, Edalat's attorney emailed a copy of Cahill's Rule 26 disclosures to Mann.[40]

### B.   The Mann Declaration

The Opposition relies largely on the Declaration of Howard Mann,[41] in which Mann testifies as follows:

Mann was a special representative and later the CEO of Alternate Health.[42]  On or around May 19, 2016, Mann met Edalat.[43]  Edalat used the trappings of wealth to convey that he was a successful and wealthy businessperson; for example, Edalat immodestly flaunted his expensive cars and

---

[35]    *Id.* at ¶ 55.

[36]    *Id.* at ¶ 57.

[37]    *Id.* at ¶ 75 (referring to *Cahill v. Edalat*, Case No. 8:16-cv-00686-AG-DFM (C.D. Cal.)).

[38]    *Id.* at ¶¶ 77 & 82.

[39]    *Id.* at ¶¶ 4 & 78.

[40]    *Id.* at ¶ 83.

[41]    *See generally* Mann Declaration.

[42]    *Id.* at ¶ 5.

[43]    *Id.*

watch.[44]  He also "bragged of large business deals he had consummated in his business under the supervision of the Food and Drug Administration."[45]  Edalat and Defendant Karpinksi talked at length with Mann "about how well their ventures had done and how they wanted to share their knowledge of various industries . . ., most particularly [regarding] what they called their patented products and what they called their successful manufacturing facility."[46]

Alternate Health entered into contracts with Edalat and related entities "in significant part because of Edalat's assertions of his wealth and success."[47]  But Edalat's assertions regarding his wealth were false.[48]  In fact, Edalat was in bankruptcy from May 2016 through early January 2017.[49]  Edalat "had never even hinted that he was in any financial trouble much less bankruptcy."[50]  Edalat had also filed bankruptcy petitions in his personal capacity in 1997 and 2005.[51]

In addition, despite Edalat's claims (as well as those of Defendants Karpinski and Barghi) "about the long success of Edalat with the FDA," Mann and Alternate Health learned "that, on November 12, 2014, the FDA brought an action against Edalat and an Edalat-controlled company called Scilabs Nutraceuticals, Inc., because they had failed to comply with FDA good manufacturing practices and because Edalat had ignored repeated warnings from the FDA about their failures to do so."[52]  Defendants, however, told their lawyer, Lee Durst (whom Alternate Health paid on behalf of Edalat), that "they

---

[44]     *Id.* at ¶ 6.
[45]     *Id.*
[46]     *Id.* at ¶ 7.
[47]     *Id.* at ¶ 8.
[48]     *See id.*
[49]     *Id.*
[50]     *Id.*
[51]     *Id.* at ¶ 10.
[52]     *Id.* at ¶ 11.

had had a problem, and that they solved the problem and everything was fine."[53] Neither Edalat, Karpinski, nor Barghi ever told Mann "about any FDA shut down."[54]

Although Mann was aware of the Cahill lawsuit, Edalat, Karpinski, and Barghi "told [Mann] that the complaint by Bruce Cahill . . . was false from beginning to end."[55] According to Mann, Edalat concealed that Edalat

> is a commercial failure who has filed for personal bankruptcy three times in the last 21 years; had many liens and judgments filed in Orange County against his affiliated companies for failing to pay state and federal taxes; and was, at the very time of the first meeting [between Edalat and Mann], in personal bankruptcy, had many suits filed against him and his affiliated companies, and had been enjoined by the FDA for his failure to comply with its safety rules in the manufacture of his products intended for human consumption.[56]

Edalat also told Mann that his affiliated company, Sentar, "had patents on an 'All Natural Non-Toxic Sublingual Drug Delivery System.'"[57]  At the time, Sentar had only an Australian patent.[58]  Edalat and Karpinski also misrepresented the effectiveness of the sublingual delivery system.[59]

On or about May 27, 2016, Mann and others representing Alternate Health visited Edalat's manufacturing facility in Irvine, California.[60]  Edalat,

---

[53]     *Id.* at ¶ 12.
[54]     *Id.*
[55]     *Id.*
[56]     *Id.* at ¶ 13.
[57]     *Id.* at ¶ 14.
[58]     *Id.* at ¶ 14; SUF ¶ 19.
[59]     Mann Declaration at ¶ 14.
[60]     *Id.* at ¶ 15.

Karpinski, and Barghi were present at the meeting.[61]  "During this visit, Edalat again spoke to the group about his and Sentar's . . . manufacturing capability for CBD sublingual tablets and told [them] that CBD transdermal patches could also be manufactured" at Sentar's facility.[62]  Edalat told the group "that he would be able to make one million pills of various kinds each day."[63]  This assertion was false because "the manufacturing facility had never made anything more than a sample of pills, was not licensed to do so, and did not have the capacity to do so, much less permission from the FDA."[64]  Edalat also "falsely claimed to [Mann] that he was an expert in the manufacture of nutraceuticals yet failed to tell [Mann] that he was subject to a court order prohibiting him from such manufacture."[65]  Edalat further told Mann "that he was the world's leading expert on nutraceuticals."[66]

On May 20, 2016, at Edalat's direction, Karpinski transmitted an email to Mann that attached a "presentation and PPM for Sentar Pharmaceuticals."[67]  As shown below, the presentation was titled "Patented Technology":[68]

---

[61]    *Id.*
[62]    *Id.*
[63]    *Id.*
[64]    *Id.*
[65]    *Id.* at ¶ 16.
[66]    *Id.* at ¶ 18.
[67]    *Id.* at ¶ 19, Ex. 5 [ECF No. 121-6].
[68]    *Id.*





The presentation contained "glowing" but "false" accounts about Sentar.[69] For example, "the presentation falsely stated that Sentar uses 'a stringently regulated manufacturing process,' which 'assures the production of safe, secure products, guaranteed to be of the highest quality.'"[70]  This "was not true, because the manufacturing system was not operational and had not been subjected to regulation, as Defendants well knew."[71]  The presentation also "repeatedly refers to all the successful financial and commercial relationships supposedly enjoyed by Sentar," but omits reference to Edalat's personal financial troubles.[72]  Mann and Alternate Health relied on these representations.[73]

---

[69]    *Id.* at ¶ 19.
[70]    *Id.*
[71]    *Id.*
[72]    *Id.*
[73]    *See id.* at ¶ 20.

"On June 27, 2016, Edalat transmitted an email to Barghi, copying Karpinski and [Mann], requesting that Barghi 'Please send Howard [Mann] our Sentar patents for the licensing contract with [A]lternate [H]ealth.'"[74] "Karpinski and Barghi each separately responded by emailing to [Mann] a chart listing nine different patents that they all claimed were owned by Sentar."[75] The chart lists "*APPLICATION* SERIAL NO." on the heading of one of the columns, but Mann "understood there were both issued patents and pending patent applications soon to issue as part of the patent rights."[76] "The patent list was material to the entry into any of the agreements because it indicated that Edalat and Sentar indeed controlled a significant number of valuable patents when in truth, as was well known to all Defendants, the patents on that list were not issued and were otherwise not valuable, contrary to what had been represented."[77]

In sum, Mann testifies as follows:

> Based on the representations of Defendants, . . . and not knowing of the failed businesses of Edalat, his three bankruptcies, the FDA injunction against him, the 27 lawsuits against him, and the many tax liens filed against him and his companies, and thus believing that Edalat was the successful business man he portrayed himself to be, particularly with all the knowledge he told me he had with products regulated by the FDA, and thus thinking that he was a perfect person with whom we could do business, using him as a

---

[74] *Id.* at ¶ 21.
[75] *Id.*
[76] *Id.* & Ex. 7 (emphasis added) [ECF No. 121-8].
[77] *Id.* at ¶ 21.

-13-

consultant and using his factory and his patented technology, Alternate Health entered into [the contracts discussed above].[78]

Although Mann was aware of the lawsuit that Cahill filed against Edalat, which raised similar allegations to those raised in this case, Mann believed—based upon discussions with Edalat, Karpinski, and Barghi—"that Cahill's claims were meritless and that it was Edalat who had been victimized by Cahill."[79] Edalat specifically told Mann that the Cahill case was "'a bullshit case.'"[80] At the time that Alternate Health entered into the agreements at issue in this case, Mann "still believed that the Cahill claims lacked merit and that Cahill was the fraud, not Edalat."[81]

## IV. **LEGAL STANDARD**

A court shall grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphases in original). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue

---

[78]     *Id.* at ¶ 25.
[79]     *Id.* at ¶ 35.
[80]     *Id.*
[81]     *Id.* at ¶ 49.

1  for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

2  (1986).

3      "Where the non-moving party bears the burden of proof at trial, the

4  moving party need only prove that there is an absence of evidence to support the

5  non-moving party's case."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th

6  Cir. 2010).  If the movant meets that burden, "the burden then shifts to the non-

7  moving party to designate specific facts demonstrating the existence of genuine

8  issues for trial."  *Id.*  "In considering a motion for summary judgment, the court

9  must examine all the evidence in the light most favorable to the non-moving

10  party."  *Porter v. California Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005).

11  ## V.  DISCUSSION

12      Defendants make three primary arguments for why summary judgment

13  should be granted in their favor on Alternate Health's claims:  (1) Alternate

14  Health was on notice of the alleged fraud because, *inter alia*, Alternate Health

15  admits that it was provided with a copy of the complaint in the Cahill case,

16  which contained substantially similar allegations to those that Alternate Health

17  pleads in the instant action; (2) the alleged misrepresentations were not material

18  to Alternate Health's decision to engage in the transactions at issue; and (3) the

19  contracts contain disclaimers that prevented Alternate Health from reasonably

20  relying on the alleged misrepresentations.  Although Defendants raise

21  substantial challenges to Alternate Health's claims, the Court concludes that

22  genuine issues of material fact remain, which preclude the entry of summary

23  judgment.

24  ### A.  Actual or Constructive Notice

25      Defendants argue that Alternate Health was on actual or constructive

26  notice regarding the true facts of which it claims to have been deceived.[82]

27

28  ---
[82]  Motion at 7:14-8:23.

Defendants maintain that Alternate Health "was put on notice of all of the allegations [in the SAC] no later than June 2016, when [Alternate Health] was provided with a copy of the Cahill complaint."[83]   According to the Motion, Alternate Health contends that it was deceived by Edalat's phony displays of wealth, the concealment of his bankruptcies, the concealment of Sentar's problems with the FDA, and misrepresentations regarding Sentar's patents.[84] Defendants argue that once Alternate Health received notice of the "detailed and serious" allegations in Cahill's complaint, Alternate Health was "charged with knowledge of everything a reasonable inquiry would have developed."[85] Specifically, Defendants argue that (1) the Cahill complaint disclosed that Edalat's display of wealth was a sham;[86] (2) a "simple search" would have disclosed Edalat's bankruptcies;[87] (3) the FDA action against Edalat and Sentar was a matter of public record;[88] and (4) Alternate Health "could easily have researched" whether Sentar owned any patents.[89]

The Court is not persuaded.  First, Alternate Health's averments are not as limited as Defendants claim.  Although many of Alternate Health's allegations center around the four issues referenced above, Alternate Health maintains that it was also deceived because Edalat misrepresented Sentar's manufacturing capabilities.[90]  Mann further testifies that Edalat falsely represented that Edalat "was the world's leading expert on nutraceuticals."[91]

---

[83]      *Id.* at 7:27-8:1.
[84]      *Id.* at 8:8-23.
[85]      *Id.* at 8:4-6.
[86]      *Id.* at 8:9-12.
[87]      *Id.* at 8:12-13.
[88]      *Id.* at 8:14-16.
[89]      *Id.* at 8:17-23.
[90]      Mann Declaration at ¶ 15.
[91]      *Id.* at ¶ 18.

1   The extent to which these representations were material to Alternate Health's

2   decision to do business with Edalat, and whether Alternate Health was on notice

3   of the true facts, are genuine issues of material fact that preclude the entry of

4   summary judgment.

5        Second, Alternate Health maintains that Edalat affirmatively

6   misrepresented the facts relating to the Cahill lawsuit.  Mann testifies that

7   Edalat told Mann that the Cahill case was "a bullshit case."[92]  Mann therefore

8   "believed Cahill was the fraud, not Edalat."[93]  In the context of Edalat's alleged

9   statements about the Cahill case, whether Alternate Health reasonably relied

10  upon Edalat's representations is a disputed question of material fact.[94]

11       Third, as Alternate Health argues, "California courts have definitively

12  held that negligence is not a defense to claims based on intentional deception."

13  *LL B Sheet 1, LLC v. Loskutoff*, 362 F. Supp. 3d 804, 827 (N.D. Cal. 2019)

14  (collecting cases).  "It is well established in California that in an action for fraud

15  or deceit, negligence on the part of the plaintiff in failing to discover the falsity of

16  the defendant's statement is no defense when the misrepresentation was

17  intentional."  *Manderville v. PCG&S Grp., Inc.*, 146 Cal. App. 4th 1486, 1502

18

19  [92]     *Id.* at ¶ 35.

20  [93]     *Id.* at ¶ 49.

21  [94]     In their Reply, Defendants argue that Mann's testimony regarding
    Edalat's statements about the Cahill case cannot preclude summary judgment
22  because the Mann Declaration is inconsistent with the SAC.  Reply at 5:19-7:12.
    Specifically, Defendants argue that the SAC, unlike the Mann Declaration, does
    not allege that Edalat provided "assurances" regarding the Cahill case.  *Id.*
23  Rather, the SAC alleges that Alternate Health learned of the fraud in June
    2017—*before* the jury verdict in the Cahill case in August of the same year.  *See*
24  *id.* at 6:10-13.  But when viewed in the light most favorable to the non-moving
    party, the SAC is not necessarily inconsistent with the Mann Declaration.  The
25  SAC avers that Alternate Health learned about the alleged fraud "***commencing***
    in June 2017."  SAC at ¶ 62 (emphasis added).  This is not inconsistent with
26  Mann's testimony that he "did not have reason to doubt Edalat until we began
    to have problems in late June 2017."  Mann Declaration at ¶ 50.  Although the
27  SAC does not refer to the Cahill case, "[t]he purpose of a complaint is not . . . to
    inform the opposing party of every fact underlying the plaintiff's claims."  *In re*
28  *Metro. Sec. Litig.*, 532 F. Supp. 2d 1260, 1278 (E.D. Wash. 2007).

-17-

1    (2007).  Thus, even if Alternate Health should have conducted further diligence

2    and should have discovered that Defendants' representations were fraudulent,

3    this failure on Alternate Health's part would not necessarily bar a claim for

4    fraud.[95]  *See Seeger v. Odell*, 18 Cal. 2d 409, 415 (1941) (in cases of intentional

5    misrepresentation, plaintiff "is not held to constructive notice of a public record

6    which would reveal the true facts").

7         When viewed in the light most favorable to the non-moving parties,

8    whether Alternate Health's failure to conduct further diligence was so

9    unreasonable as to absolve Defendants of liability for the purported fraud is a

10   genuine issue of material fact that precludes the entry of summary judgment or

11   partial summary judgment.

12   **B.    Materiality of Representations**

13        Defendants correctly note that a claim for fraud requires the alleged

14   misrepresentations or omissions to be material.[96]  *See, e.g.*, *City of Atascadero v.*

15   *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 481 (1998)

16   (elements of common law fraud are "(1) misrepresentation of a material fact [];

17   (2) knowledge of falsity (scienter); (3) intent to deceive and induce reliance;

18   (4) justifiable reliance on the misrepresentation; and (5) resulting damage").

19   "A misrepresentation is judged to be material if a reasonable man would attach

20   importance to its existence or nonexistence in determining his choice of action

21   in the transaction in question."  *Engalla v. Permanente Med. Grp., Inc.*, 15

22   Cal. 4th 951, 977 (1997) (citations and quotations omitted).  Materiality is

23   therefore "generally a question of fact unless the fact misrepresented is so

24

25   ───────────────

26   [95]    In their Reply, Defendants discuss at length *Stevenson v. Baum*, 65
     Cal. App. 4th 159 (1998).  Reply at 3:13-5:19.  That case, however, involved "the
     mere alleged failure to disclose" rather than the "active, affirmative, intentional
27   misrepresentation" that Alternate Health contends occurred here.  *See
     Stevenson*, 65 Cal. App. 4th at 166-67.

28   [96]    Motion at 8:26-27.

obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it." *Id.*

Defendants contend that "[t]he alleged fraud for the most part goes to Paul Edalat's background and character," which "is not material to the License, Manufacturing or APS agreements, each of which involve [the] sale of technology or goods."[97]  This line of argument oversimplifies Alternate Health's contentions.  As discussed above, Alternate Health contends not only that it was misled regarding Edalat's character, but also that Edalat misrepresented Sentar's manufacturing capabilities.[98]  Mann also testifies that Edalat misrepresented that Edalat "was the world's leading expert on nutraceuticals."[99]  These alleged misrepresentations are not inherently immaterial merely because the contracts involved the sale of technology or goods.  In their Motion, Defendants analogize the facts of this case to a car salesman who lies about his criminal record, arguing that "if the car works as advertised, it is not fraud if the salesman turns out to have a criminal record."[100] But this creative hypothetical is distinguishable from the facts of this case. Edalat did not sell a used car; rather, the contracts at issue involved the commercial sale of nutraceuticals and the licensing of product formulations and patent applications.  Such contracts at least arguably involve the application of specialized or technical knowledge for which aspects of Edalat's background could be material to Alternate Health's decision to enter into them.

Defendants also maintain that any alleged misrepresentation or omission regarding the FDA lawsuit against Sentar and Edalat could not be material to the

---

[97]     *Id.* at 8:27-9:3.

[98]     Mann Declaration at ¶ 15.

[99]     *Id.* at ¶ 18.

[100]    Motion at 9:3-5.

Manufacturing Agreement because Alternate Health "accepted the goods."[101] "Acceptance of goods occurs when the buyer . . . [f]ails to make an effective rejection . . . ." Cal. Com. Code § 2606(1)(b). "[I]f the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may . . . [a]ccept any commercial unit or units and reject the rest." Cal. Com. Code § 2601(c).

Under the Manufacturing Agreement, Alternate Health agreed to pay Sentar $150,000 "to manufacture and bottle the tablets," with a final payment of $50,000 due upon delivery of the tablets.[102] The written agreement is silent with respect to the quantity of the tablets to be delivered.[103] Mann testifies that Alternate Health received only 10,000 tablets, rather than the 50,000 tablets that Alternate Health claims to have expected.[104] Alternate Health does not dispute that it paid $50,000 on delivery of the tablets, nor does it contend that it rejected the delivery as non-conforming.[105]

Although the undisputed facts appear to show that Alternate Health accepted the tablets that it received, Alternate Health has not asserted a breach of contract claim. Rather, Alternate Health contends that it would never have entered into the agreement with Sentar if it had known the true facts regarding Sentar and Edalat.[106] The fact that Alternate Health accepted the tablets might be relevant to show whether Alternate Health suffered injury,[107] but it does not

---

[101] *Id.* at 9:6-7.

[102] SUF at ¶ 44

[103] *See id.*

[104] Mann Declaration at ¶ 32.

[105] *See* SGD at ¶¶ 47-49.

[106] *See, e.g.*, SAC at ¶ 74.

[107] Because Alternate Health seeks to recover under a tort theory rather than a contract theory, the correct measure of damages "is the 'out-of-pocket' measure; successful tort plaintiffs are not entitled to have damages computed on a contract, or 'benefit-of-the-bargain,' theory." *Christiansen v. Roddy*, 186 Cal. App. 3d 780, 790 (1986). Alternatively, a contract may be rescinded when the aggrieved party's consent was procured by fraud. Cal. Civ. Code § 1689(b)(1); *see also Alliance Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1240

-20-

necessarily mean that Alternate Health was not fraudulently induced to enter into the contract in the first place, and Defendants cite no authority to support such a proposition.

Genuine issues of material fact therefore preclude entry of summary judgment or partial summary judgment with respect to the materiality of the alleged misrepresentations.

## C.   <u>Disclaimers of Warranty</u>

Finally, Defendants note that both the License Agreement and the APS Agreement contain express disclaimers of warranty of merchantability or fitness for a particular use.[108]  Defendants argue that these warranties bar any claims that the technology that Alternate Health purchased under these agreements did not work as expected.[109]  Specifically, the License Agreement states,

> This License, Licensor Patent Rights and Licensor Copyright Rights are provided WITHOUT WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED. LICENSOR MAKES NO REPRESENTATION OR WARRANTY THAT LICENSED METHOD, LICENSED PROCESSES, LICENSOR PATENT RIGHTS, LICENSOR COPYRIGHT RIGHTS OR ANY LICENSED PRODUCT WILL NOT INFRINGE ANY PATENT OR OTHER PROPRIETARY RIGHT.[110]

---

(1995) ("unless the plaintiff merely seeks to rescind the contract, it must suffer actual monetary loss to recover on a fraud claim").  Defendants do not argue that Alternate Health has failed to adduce evidence of injury.

[108]   Motion at 9:19-10:17.

[109]   *Id.*

[110]   SUF at ¶ 21.

The License Agreement also "expressly disclaimed any warranty that the patent rights were even valid (i.e. that patents would even be issued),"[111] and it contained "an express limitation of liability arising from any claims including tort."[112]  Likewise, the APS Agreement contains the following disclaimer: "This License, Licensed Product(s) and Licensor Copyright Rights are provided WITHOUT WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED."[113]  Defendants contend that Alternate Health "is by its own admission a sophisticated party" and "should be bound by the disclaimer of warranty in the agreements."[114]

Under California law, however, "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."  Cal. Civ. Code § 1668.  "[A] party may not contract away liability for fraudulent or intentional acts . . . ."  *Manderville*, 146 Cal. App. 4th at 1500 (quotation and citation omitted).  Thus, the waiver clauses in the License Agreement and the APS Agreement do not automatically bar Alternate Health's fraud claims.  Further, Alternate Health does not contend solely that it relied upon misrepresentations regarding the status of the patents or the effectiveness of the pet formulas.  Rather, Alternate Health also maintains that it relied upon misrepresentations regarding Edalat's background and his company's history and capabilities, both of which are at least arguably beyond the scope of the disclaimers.[115]  Genuine

---

[111]     *Id.* at ¶ 22.
[112]     *Id.* at ¶ 23.
[113]     *Id.* at ¶ 55.
[114]     Motion at 10:15-17.
[115]     *See, e.g.*, Mann Declaration at ¶¶ 16-20.

issues of material fact therefore preclude the entry of summary judgment or partial summary judgment.

## VI.   CONCLUSION

For the foregoing reasons, the Court hereby **ORDERS** as follows:

1.      Defendants' instant Motion is **DENIED**.

2.      The parties are **DIRECTED** to meet and confer and, no later than 12:00 noon on May 28, 2021, to file a Joint Status Report advising the Court of their collective proposal for the schedule for the Pretrial Conference and trial.  If the parties cannot reach an agreement on those dates, then the Joint Status Report shall recite each party's respective proposal, the justification therefor, and detailed reasons for the parties' disagreement.

3.      The Court sets a Status Conference at 11:00 a.m. on June 4, 2021, in Courtroom 2 of the George E. Brown, Jr. Federal Building & U.S. Courthouse, located at 3470 Twelfth Street, Riverside, California.

**IT IS SO ORDERED.**

Dated: May 19, 2021

John W. Holcomb
UNITED STATES DISTRICT JUDGE